Hugh L. CAREY, Edward I. Koch, Alan Chou, Rose L. Dawson, Shmuel Lefkowitz, Michael Loizou, Edwin Martinez, Walter E. Marx, Brunilda Pacheco, Lamuel Stanislaus, the State of New York, and the City of New York, Plaintiffs,

v.

Philip M. KLUTZNICK, Secretary of Commerce, Vincent P. Barabba, Director, Bureau of the Census, William F. Hill, Regional Director, New York Region, Bureau of the Census, Richard Bitzer, Acting Assistant Regional Director, New York Region, Bureau of the Census, Arthur G. Dukakis, Regional Director, Boston Region, Bureau of the Census, United States Department of Commerce, Bureau of the Census, Jimmy Carter, President of the United States, and Edmund L. Henshaw, Jr., Clerk of the United States House of Representatives, Defendants.

No. 80 Civ. 4550 (HFW).

United States District Court,
S. D. New York.

Oct. 1, 1980.

See also D.C., 88 F.R.D. 249 and D.C.,
508 F.Supp. 416; 2nd Cir., 637 F.2d 834;
D.C., 508 F.Supp. 420.

Cravath, Swaine & Moore, New York City, for all plaintiffs except the State of New York and Hugh L. Carey; Frederick A. O. Schwarz, Jr., David A. Barrett, Roger D. Einerson, Francis P. Barron, Michael J. Malone, Catherine Raymond Flickinger, Calvin R. House, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for the State of New York and the Hon. Hugh L. Carey; Robert Hermann, Peter Bienstock, Shiela Abdus–Salaam, Daniel Berger, Asst. Attys. Gen., New York City, of counsel.

Corporation Counsel of the City of New York, for the City of New York and Ed-

ward I. Koch; Allen G. Schwartz, Mary McCorry, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants; Michael H. Dolinger, Jane E. Booth, Steven E. Obus, Patrick H. Barth, Asst. U. S. Attys., New York City, of counsel.

## OPINION

WERKER, District Judge:

This action was commenced by plaintiffs Hugh L. Carey, Governor of the State of New York, and Edward I. Koch, Mayor of the City of New York, in both their official and individual capacities, several other citizens, voters and taxpayers residing within New York State, and the City and State of New York. Named as defendants are Philip M. Klutznik, Secretary of Commerce, Vincent P. Barabba, Director of the Bureau of the Census, William Hill and Arthur G. Dukakis, Regional Directors of the Census Bureau for the New York and Boston Regions, respectively, Richard Bitzer, Acting Assistant Regional Director of the Census Bureau for the New York Region, Edmund L. Henshaw, Jr., Clerk of the United States House of Representatives, the United States Department of Commerce, Bureau of the Census, and Jimmy Carter, President of the United States. By commencement of this action, plaintiffs seek to vindicate their right, under the Constitution and laws of the United States, to maintain the efficacy of their votes. *See* U.S.Const. art. I, § 2, cl. 3; U.S.Const. amends. I, V, XIV, XV; 13 U.S.C. § 1, et seq.; 5 U.S.C. § 551, et seq. They hope to accomplish this by obtaining declaratory and injunctive relief requiring the defendants to adjust census figures in a manner that would compensate for the expected undercount of the population of New York State. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1337, 1361, 2201, 2202, and 5 U.S.C. § 702.

Plaintiffs have moved for preliminary injunctive relief seeking to enjoin the defendants Klutznick, Barabba, Hill, Bitzer and the Bureau of the Census from closing any District Offices in New York State until plaintiffs have had an adequate opportunity to review preliminary census figures and until defendants have taken a variety of measures [1] to remedy what plaintiffs allege is a severe undercount of the populations of New York City and New York State. Plaintiffs also seek an order requiring the Census Bureau to undertake a statistical adjustment of the populations of the City and State to compensate for the undercount and have moved for partial summary judgment pursuant to Fed.R.Civ.P. Rule 56(a) on the issue of whether the Census Bureau has the authority to utilize statistical adjustments for the purpose of apportioning representatives in Congress. Defendants have moved under Fed.R.Civ.P. Rule 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief may be granted, lack of standing, lack of a justiciable claim under the political question doctrine, and lack of ripeness. Defendants also have moved pursuant to Fed.R.Civ.P. Rule 26(c) for an order staying all discovery pending disposition of their motion to dismiss. This motion already has been disposed of by prior orders of the Court. Defendants also have moved for partial summary judgment under Fed.R.Civ.P. Rule 56(a) on the issue of whether the procedures adopted by the Census Bureau for conducting the 1980 Census were rational and were executed in a rational manner. The Court will now decide only the defendants' motion to dismiss, plaintiffs' motion for partial summary judgment and defendants' motion for partial summary judgment. Hearings on plaintiffs' motion for a preliminary injunction have been deferred until October 6, 1980.

## BACKGROUND

The United States Constitution provides that "[r]epresentatives shall be apportioned

---

1. Plaintiff's motion for preliminary injunctive relief seeks, in part, to enjoin defendants from closing Census Bureau District Offices in New York State until the Bureau has attempted to enumerate persons that were missed in the original count, further attempts have been made to re–enumerate persons whose questionaires were lost or who were labelled "last resort", and all quality control procedures have been adhered to by the Census Bureau.

among the several States according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed." U.S.Const. amend. 14, § 2. The population figures upon which apportionment is based are derived from the results of the decennial census. *See* U.S.Const. art. 1, § 2, cl. 3. Plaintiffs allege that there has been a serious undercount of the populations of New York State and New York City in the present decennial census and that because of this, New York will lose at least one representative to which it is entitled and also will be denied substantial amounts of federal funds that are allocated on the basis of census population figures. Plaintiffs assert that the undercount is a well known phenomenon that has existed in the past and will occur again in 1980. They claim that the undercount is particularly severe with respect to certain classes of so called "hard to enumerate" persons and certain areas of the country. The "hard to enumerate" groups include Blacks, Hispanics, other racial and ethnic minorities, aliens, non–English speaking individuals, the poor, and those living in high–crime areas. According to plaintiffs, New York State and New York City contain a disproportionate number of the "hard to enumerate" when compared to the nation as a whole. As a consequence, they claim that the undercount for New York will be substantially higher than that for other areas of the country. Plaintiffs suggest that the undercount can be remedied by the use of statistical and demographic techniques currently available to the Census Bureau but that it has refused and will continue to refuse to do so at least for the purpose of apportionment of representatives.[2]

## DISCUSSION

### *Standing*

Defendants' contend that plaintiffs' lack standing to maintain this action because the harm they raise is merely specula-

tive and because they are unable to demonstrate that the relief they seek will benefit them personally. This Court first notes that when ruling on a motion to dismiss for lack of standing, all material allegations of the complaint must be accepted as true and the complaint construed in favor of the complaining party. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Consequently, the court must accept as true that there will be a disproportionate undercount of the populations of New York City and New York State, resulting in an "undercount for New York [that] will be substantially higher in percentage terms [and in absolute numbers] than it will be for the rest of the United States." Complaint at ¶ 33. It also must accept as true that New York State will be deprived of its full share of representatives in Congress if the undercount is not remedied, complaint at ¶ 39, and that there are feasible means by which the Census Bureau can adjust its count to compensate for the undercount. Complaint at ¶ 35. For purposes of this motion, this court also must assume that the Census Bureau's failure to adopt procedures to remedy the undercount, if established, would be adjudged to violate the constitutional rights of plaintiffs. Complaint at ¶ 55; *see Warth v. Seldin*, 422 U.S. at 502, 95 S.Ct. at 2207.

The concept of standing involves both constitutional and prudential limitations on the exercise of a court's jurisdiction. It requires that a court decide only cases or controversies. As stated by Mr. Justice Powell in *Warth v. Seldin*:

[a]s an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.... A federal court's jurisdiction ... can be invoked only when the plaintiff himself has

---

**2.** This failure to adjust, plaintiffs assert, also will have the effect of causing malapportionment of legislative districts for the election of representatives to the New York State legisla-

ture since intrastate apportionment in New York is based upon the results of the decennial census.

suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .'

*Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *see Alexander v. Yale University*, 631 F.2d 178, (2d Cir. 1980). Thus, the elements comprising standing are (1) concrete harm to the plaintiff (2) caused by the challenged actions of the defendant (3) that can be redressed by the Court. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72–74, 98 S.Ct. 2620, 2630–2631, 57 L.Ed.2d 595 (1978).

■ While a "generalized grievance" shared by a large number of citizens usually will not justify the exercise of jurisdiction, *see Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), the mere circumstance that many individuals share the same injury is an insufficient ground for precluding an aggrieved person from seeking review of an agency's action. *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973).

■ Standing is not derived from the merits of a plaintiff's claim that certain conduct is illegal, but it frequently may depend on "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. at 500, 95 S.Ct. at 2206. In *Baker v. Carr*, for example, plaintiffs sued under 42 U.S.C. §§ 1983 and 1988 alleging that a Tennessee statute apportioning the state legislature violated the equal protection clause because it created severe imbalances in the proportion of voting population to representation. *Baker v. Carr*, 369 U.S. at 207, 82 S.Ct. at 704. The Court held that plaintiffs had standing to bring the suit, stating that plaintiffs had asserted " 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right, possessed by every citizen, to require that the Government be administered according to law.' " *Id.* at 208, 82 S.Ct. at 705, quoting *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939), and *Fairchild v. Hughes*, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922). Cases in which voter standing was found to exist that were cited with approval by the *Baker* Court were not limited to challenges to apportionment of state legislatures. Rather, they included challenges by state residents to apportionment of federal congressional districts. *See, e. g., Colegrove v. Green*, 328 U.S. 549, 550, 568, 66 S.Ct. 1198, 1209, 90 L.Ed. 1432 (1946).

Based on a review of the foregoing authorities, it would appear that the claim asserted by the plaintiffs in the case at bar is indeed cognizable by this court. Faced with a similar challenge to the census, however, the Court in *FAIR v. Klutznick*, 486 F.Supp. 564 (D.D.C.1980), found that plaintiffs had failed to establish standing since they had been unable to demonstrate that a concrete harm would occur to one of them and that the relief requested would benefit them personally. The Court stated:

> While the plaintiffs estimate that between one and sixteen congressional seats will be affected depending on its inclusion of illegal aliens, they can do no more than speculate as to which states might gain and which might lose representation. . . . Depending on how many illegal aliens there are, where they live, how accurate the census count is, and the interplay of all the other population factors which affect apportionment, any of a number of states might benefit by the relief requested by the plaintiffs; the only effect which seems inevitable is that California would lose seats, though again, how many is a matter of speculation. Therefore, *none* of the plaintiffs are able to allege that the weight of his or her vote in the next decade *will be affected* by the expected method of taking the census and apportioning congressional

seats.... Despite diligent search, we have been unable to find a single case in which standing was granted to a plaintiff because *some* harm was likely to occur and it *might* affect the litigant personally, and we have been referred to no such case.

*Id.* at 570 (emphasis in original).

█ It is suggested that the facts of *FAIR* are distinguishable from those of *Carey*, and that therefore, the *FAIR* Court's analysis is not persuasive in this Court's evaluation of the present controversy. First, the injury alleged in *Carey*, the substantial undercount of the population of New York, is fairly well ascertainable at this point in time. Although it cannot be said with precision what the exact undercount in New York is or to what extent the undercount in New York will be disproportionate to that in other states, it would appear that plaintiffs' allegations amount to more than mere speculation. Preliminary figures and reports concerning the undercount in New York and other states currently are available to the Census Bureau and the plaintiffs. These tabulations provide the basis for estimates of the extent of the undercount in New York and elsewhere. Thus, it appears that the alleged harm to plaintiffs is sufficiently concrete. In addition, as residents and voters of New York State, plaintiffs have demonstrated their personal stake in the outcome of this controversy and that the relief they seek, if ultimately granted by this court, would benefit them personally. Finally, it must be remembered that on a motion to dismiss for lack of standing, the court must accept the allegations of plaintiffs' complaint as true, and need not determine whether plaintiffs' "allegations of impairment ... will, ultimately, entitle them to relief in order to hold that they have standing to seek it." *Baker v. Carr*, 369 U.S. at 208, 82 S.Ct. at 705.

### Political Question

█ Defendants contend that plaintiffs challenge to the manner in which the census was conducted raises a non–justiciable political question. Our evaluation of this contention must begin with the case of *Baker v. Carr*, in which the Supreme Court set forth clearly the principles underlying the political question doctrine. The *Baker* Court stated that the issue of whether a suit involves a political question is essentially a "function of the separation of powers" between the judiciary and the coordinate branches of the federal government. Thus, determining if a case involves a political question involves a decision of "whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed" to it. The Court as "ultimate interpreter of the Constitution" bears the responsibility for making this evaluation. *Baker v. Carr*, at 210–11, 82 S.Ct. at 706.

█ Merely because a litigant seeks the protection of political rights does not necessarily mean that his suit raises a political question. *Id.* at 209, 82 S.Ct. at 705. The Court in *Baker* found that plaintiffs' claim that their votes were being debased in violation of the equal protection clause was justiciable and that if "discrimination [were] sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights." *Id.* at 209–10, 82 S.Ct. at 706. Of course, it must be observed that *Baker* involved a challenge to the apportionment of the Kentucky legislature, and therefore, presented no conflict between the federal judiciary and Congress, a situation which, under the Court's explanation of the political question doctrine, would be more likely to present a nonjusticiable question. *See id.* at 210, 82 S.Ct. at 706. Nevertheless, the *Baker* Court reviewed the holding of *Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) which involved a challenge to Congressional apportionment. The Court found that "on the issue of justiciability, all four justices comprising a majority relied upon *Smiley v. Holm*," 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), which, with the two

other cases of *Koenig v. Flynn*, 285 U.S. 375, 52 S.Ct. 403, 76 L.Ed. 805 (1932) and *Carroll v. Becker*, 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807 (1932), "settled the issue in favor of justiciability of questions of congressional redistricting." *Baker v. Carr*, 369 U.S. at 232, 82 S.Ct. at 718. Two years following its decision in *Baker*, the Court reaffirmed its view that challenges to Congressional apportionment were justiciable. *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

While *Carey v. Klutznick* involves a challenge to the census, and not precisely a challenge to congressional redistricting, the former provides the foundation for apportionment and redistricting and, therefore, the precedents sustaining challenges to congressional redistricting should afford a predicate for finding the claims before the court justiciable. Furthermore, there have been several cases in which challenges to census procedures have in fact been entertained by the federal courts. *See, e. g., Borough of Bethel Park v. Stans*, 449 F.2d 575 (3d Cir. 1971); *City of Camden v. Plotkin*, 466 F.Supp. 44 (1978); *Quon v. Stans*, 309 F.Supp. 604 (1970).

■ The most difficult issue to resolve in the area of nonjusticiability is that the language of Art. 1, § 2, cl. 3 provides that the census is to be taken in such manner as Congress shall by law direct. This would appear to constitute "a textually demonstrable constitutional commitment of the issue to a coordinate political department." Under the principles elaborated in *Baker v. Carr*, such commitment usually indicates the existence of a political question. It nevertheless appears to the Court that in a case such as this, there exists the overriding consideration that the Framers also intended to extend the authority of the judicial branch should to those controversies which concern the execution of the provisions expressly contained in the articles of Union," *see* A. Hamilton, J. Madison, and J. Jay, *The Federalist*, No. LXXX, p. 494 (Lodge ed. 1888), for "maintaining in practice the necessary partition of power among the several departments [can only be accom-plished] by so contriving the interior structure of the government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places." *See id.* No. LI, p. 322. In language strongly apropos to our present inquiry, the Court, in *Wesberry v. Sanders*, stated:

[The] statement in *Baker*, which referred to our past decisions holding congressional apportionment cases to be justiciable, we believe was wholly correct and we adhere to it. Mr. Justice Frankfurter's *Colegrove* opinion contended that Art. I, § 4, of the Constitution had given Congress "exclusive authority" to protect the right of citizens to vote for Congressmen, but we made it clear in *Baker* that nothing in the language of that article gives support to a construction that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction, a power recognized at least since our decision in *Marbury v. Madison*, 1 Cranch 137, [2 L.Ed. 60] (1803). The right to vote is too important in our free society to be stripped of judicial protection by such an interpretation of Article I.

*Wesberry v. Sanders*, 376 U.S. at 6–7, 84 S.Ct. at 529. (citations omitted). Thus, it appears that both precedent and the intent of the Framers warrant the conclusion that the issues presented in *Carey v. Klutznick* are justiciable.

### RIPENESS

Defendants have also sought dismissal of plaintiffs' action on the ground that the claims they assert are not ripe for judicial review. In the context of challenges to the decisions of administrative bodies, the underlying rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formal-

ized and its effects felt in a concrete way by the challenging parties." The concept requires a determination as to the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). *Abbott* involved a challenge by drug manufacturers to regulations promulgated by the Commissioner of Food and Drugs exercising authority delegated to him by the Secretary of HEW to enforce certain congressional legislation. On the first issue, that of fitness of the issues for judicial resolution, the Court found that (1) the question presented for decision was the purely legal one of whether the statute at issue was properly interpreted by the Commissioner and that (2) when *expected* conformity with agency regulations will cause injury, the agency's action is subject to judicial review. A party is not required to wait until an agency regulation is actually put into effect in order to assert that he is injured by it. *Id.* at 149–50, 87 S.Ct. at 1515–16. On the issue of hardship to the parties, the Court found that "the impact of the regulations . . . [was] sufficiently direct and immediate as to render the issue appropriate for judicial review." *Id.* at 152, 87 S.Ct. at 1517.

▆▆▆▆ The similarity of *Abbott* to *Carey v. Klutznick* is striking. First, the underlying question presented for review in this case is the legal one of whether the Commissioner of the Census Bureau has correctly interpreted the applicable constitutional and statutory provisions concerning whether statistical adjustments may be used in apportioning representatives for Congress. Second, expected conformity with the Census Bureau's interpretation that adjustments may not be utilized for this purpose clearly will cause injury to these plaintiffs in the form of dilution of their votes. The only aspect in which *Carey* and *Abbott* differ is that the ruling at issue in *Abbott* was promulgated in the form of a regulation in the CFR. There is no evidence in *Carey* that the Commissioner's position was reported so formally. It would appear, however, that if his opinion was

stated as the final official position of the Bureau on the matter, it may be deemed final. Since the Department of Justice has argued before this Court on behalf of the Census Bureau that it is not required to adopt such procedures it would indeed appear that this is the final and official position of the Census Bureau. As was noted by the *Abbott* Court, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic and [flexible] way." *Id.* at 149–50, 87 S.Ct. at 1516.

As further observed by the Court in *Duke Power Co. v. Carolina Environmental Study Group*, the issue of ripeness is an aspect of the case or controversy requirement. A conclusion that the plaintiffs will suffer immediate injury as a result of the defendant's conduct and that the injury would be redressed by the relief sought will suffice to satisfy that requirement. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. at 81, 98 S.Ct. at 2634. The prudential aspect of the ripeness doctrine, involves the timing of the plaintiff's request for relief. Where "delayed resolution of [the] issues would foreclose any relief from the present injury suffered by [plaintiff]" and review would also be beneficial to the defendant, there is no reason to defer consideration of the issues presented. Certainly, this language applies to *Carey* in that if judicial resolution of the issue of whether statistical adjustment may be utilized in the apportionment process is delayed, plaintiffs will be precluded from relief because final figures for this purpose must be submitted by the Census Bureau to the President by Dec. 31, 1980. *See generally Central Hudson Gas & Electric Co. v. Environmental Protection Agency*, 587 F.2d 549, 560 (2d Cir. 1978). For the foregoing reasons, this court concludes that the issues presented by plaintiffs are ripe for judicial review.

### Failure to State a Claim for Relief

▆▆▆ Defendants contend that plaintiffs' allegations of the Census Bureau's mismanagement of the 1980 Census contained in count I of the complaint fail to state a

claim upon which relief may be granted. They assert that under sections 702 and 701(a) of the Administrative Procedure Act, 5 U.S.C. §§ 702, 701(a), plaintiffs have no right to challenge the day–to–day management of the census because Congress has vested the Census Bureau with nonreviewable discretion to design and manage the procedures utilized in the decennial Census. In assessing defendants' contentions, the Court first notes that on a motion to dismiss for failure to state a claim upon which relief may be granted, it must accept the allegations of the complaint as true and should not dismiss the complaint unless it appears to a legal certainty that plaintiffs cannot establish any facts entitling them to relief. *See Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

Viewed in this perspective, the Court finds that while plaintiffs have challenged the procedures utilized by the Census Bureau, they have not sought to obtain a ruling that one or more of the particular procedures was invalid. Rather, plaintiffs merely were attempting to demonstrate that the overall effect of the Census Bureau's methods was to create an undercount of the populations of New York State and New York City that is so severe as to cast grave doubt on the constitutionality of any congressional apportionment that ultimately is based on the census count. Indeed, plaintiffs in their demand for relief have not requested that this court invalidate any particular methods adopted by the Census Bureau for enumerating the population. It therefore appears that although the Constitution delegates to Congress the authority to determine the manner in which the Census is to be taken, U.S.Const. art. I, § 2, cl. 3, and that Congress in turn has delegated the responsibility for taking the Census to the Bureau of the Census under the direction of the Secretary of Commerce, 13 U.S.C. §§ 2, 141, judicial review is not precluded in this case. In a case analogous to that at Bar, the Court of Appeals for the D.C. Circuit recently observed that:

> "construction of [a] finality provision that foreclose[s] inquiry into the constitutionality of ... challenged legislation would

raise serious question as to the constitutionality of the finality provision itself.... [I]f legislation by Congress purporting to prevent judicial review of the constitutionality of its own actions is itself constitutionally suspect, legislation that frees an administrative agency from judicial scrutiny of its adherence to the dictates of the Constitution must pose grave constitutional questions as well. Not only is it daring to suggest that Congress, though subject to the checks and balances of the Constitution, may create a subordinate body free from those constraints; it also beggars the imagination to suggest that judicial review might be less crucial to assuring the integrity of administrative action than it is to make certain that Congress will operate within its proper sphere. If the courts are disabled from requiring administrative officials to act constitutionally, it is difficult to see who would perform that function. We say that a statute purporting to foreclose judicial redress of constitutional violations allegedly perpetrated by an administrative agency must be construed in accordance with the standards articulated in *Johnson v. Robison.*

*Ralpho v. Bell*, 569 F.2d 607, 620 (D.C.Cir. 1977), citing, *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

Hence, a court must determine "whether Congress intended an interpretation of such dubious validity." *Ralpho v. Bell*, 569 F.2d at 620. In this case, it cannot be said that Congress intended such a result. There is no evidence that Congress, by delegating the responsibility for taking the census to the Secretary of Commerce and Bureau of the Census, intended to vest in them nonreviewable authority on an issue posing grave constitutional questions. Consequently, this Court does not believe that it is precluded from reviewing an agency determination that affects a vital aspect of an individual's constitutionally guaranteed rights. Furthermore, as noted in our discussion of the political question issue, the numerous cases in which challenges to particular methods utilized by the Census Bureau have been

entertained by the federal courts belie defendants' contention that such review is precluded. *See, e. g., Borough of Bethel Park v. Stans,* 449 F.2d at 577; *City of Camden v. Plotkin,* 466 F.Supp. at 52; *Quon v. Stans,* 309 F.Supp. at 605.

### Statistical Adjustment

Defendants also have moved to dismiss the complaint on the ground that plaintiffs' claim for an adjustment of the census figures for New York fails to state a claim upon which relief may be granted. Plaintiffs, on the other hand, have moved for partial summary judgment on the issue of whether the Census Bureau has the authority to utilize statistical adjustments to improve the accuracy of census figures for New York. These conflicting claims will be analyzed together.

Plaintiffs contend that the Census Bureau does have the authority to make statistical adjustments for the purpose of apportionment for the following reasons. First, they argue that the phrase "the whole number of persons in each state" requires that defendants ascertain "as nearly as is practicable" the actual population of each state. Second, plaintiffs allege that the Census Bureau in 1970 utilized statistical adjustments for the purpose of apportionment. Third, they assert that Congress in the past has granted adjustments to states in which there had been an undercount. Defendants, on the other hand, assert that under the Constitution, they are empowered only to take a headcount of the population. They also assert that they are precluded from employing statistical adjustments by section 195 of the Census Act.

Our evaluation of these contentions must begin with an inquiry into what the Framers of the Constitution meant by the term "whole number of persons in each state." At the Constitutional Convention of 1787, there was substantial disagreement as to whether representation would most appropriately be based on the population or wealth of each state, or rather should be apportioned equally. *See* A. Hamilton, J. Madison, and J. Jay, *The Federalist,* No.

LIV pp. 339–44 (Lodge ed. 1888). The resolution of the disagreement was embodied in the so–called Great Compromise under which the states were to have equal representation in the Senate while representation in the House of Representatives was to be based on the population of each state. In order to insure that the distribution of representatives among the states would accurately reflect shifts in population, the Framers provided for periodic reapportionment based on the decennial census. *Id.* No. LVIII p. 362. According to the Framers, the purpose of the requirement that there be a decennial census is to "readjust, from time to time, the apportionment of representatives to the number of inhabitants, under the single exception that each state shall have one representative at least...." *Id.*

It appears to the Court that this language indicates an intent that apportionment be based on a census that most accurately reflects the true population of each state. We cannot accept the defendants' position that the phrase "actual enumeration" used in Art. 1, § 2, cl. 3, requires otherwise. Indeed, Webster's defines "actual" as "existing in fact or reality" and defines "enumeration" as a "listing" or "counting." Webster's Third New International Dictionary (1971). When combined, these terms require a count of the population most reflective of the true facts or reality, and thereby supports the conclusion that apportionment is to be based on census tabulations that most accurately reflect the population of each state.

The Supreme Court's decision in *Wesberry v. Sanders,* further supports this view. In *Wesberry,* the Court found that:

The debates at the Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent "people" they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants. The Constitution embodied Edmund Randolph's proposal for a periodic census to ensure "fair rep-

resentation of the people" an idea endorsed by Mason as assuring that "numbers of inhabitants" should always be the measure of representation in the House of Representatives. . . .

.    .    .    .    .

· · It would defeat the principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people—for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a representative than others.

*Wesberry v. Sanders,* 376 U.S. at 13–14, 84 S.Ct. at 533. As was noted by Judge Guy in *Young v. Klutznick,* 497 F.Supp. 1318 (E.D. Mich.1980), it is but a short step from the reasoning employed in *Wesberry* to the conclusion that census figures must accurately reflect the populations of each state in order to preserve the efficacy of an individual's vote.

■ Defendants also contend that the Census Act precludes the utilization of statistical adjustment for the purpose of apportioning representatives. More specifically, they argue that 13 U.S.C. § 195 prohibits the use of adjustments for this purpose. That section provides that "sampling" may be used in carrying out the provisions of title 13 "except for the determination of population for purposes of apportionment of Representatives in Congress." 13 U.S.C. § 195. At first glance, defendants position appears correct. However, section 141(a) of the Census Act also must be considered. That section provides that the Secretary of Commerce shall . . . take a decennial census of the population . . . in such form and content as he may determine, including the use of sampling procedures and special surveys. In the face of these apparently conflicting directives, the Court must adopt an interpretation that nullifies neither provision and gives effect and meaning to both. In order to do this,

the Court must conclude that the sole use of sampling procedures has been authorized only for purposes other than tabulating census figures for the purpose of apportionment and that in the area of apportionment where important constitutional rights are at stake, the Census Bureau may utilize sampling procedures but only in addition to more traditional methods of enumeration. *See Young v. Klutznick,* 497 F.Supp. 1318 (E.D.Mich.1980). Consequently, the Court finds that defendants constitutional and statutory objections concerning the impropriety of employing statistical adjustments to compensate for the undercount without merit.

### Defendants' Motion for Partial Summary Judgment

■ Defendants have moved for partial summary judgment dismissing Count I of the Complaint. They contend that the Census Bureau's conduct is not subject to judicial review or that if review is permissible, it is limited to the question of the rationality of the Bureau's actions. The Court has already determined that the conduct of the Census Bureau is not immune from judicial review. Assuming without deciding that defendants are correct in asserting that the scope of any review the Court may undertake would be limited to whether there was a "rational basis" for the Census Bureau's conduct, the Court finds that there are substantial factual questions concerning the rationality of the Bureau's actions which remain to be adjudicated. Consequently, defendants' motion for partial summary judgment is denied.

### Conclusion

In accordance with the above, defendants' motion to dismiss the complaint is hereby denied[3] and plaintiffs' motion for partial summary judgment is hereby granted. Defendants' motion for partial summary judgment is denied.

SO ORDERED.

---

3. The Court, after considering defendants' contentions that Counts III and IV of the Complaint fail to state a claim upon which relief

may be granted, finds that it need not dismiss those counts at this time.