**PANTONE, INC., Plaintiff–Appellant,**

v.

**ESSELTE LETRASET, LTD.,**
**Defendant–Appellee.**

**No. 997, Docket 88–7775.**

United States Court of Appeals,
Second Circuit.

Argued April 10, 1989.

Decided June 28, 1989.

Steven B. Pokotilow, New York City (Anita K. Young, Blum Kaplan, New York City, of counsel), for plaintiff-appellant.

Morris Relson, New York City (Beverly B. Goodwin, Andrew Baum, Darby & Darby, New York City, of counsel), for defendant-appellee.

Before NEWMAN, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This appeal concerns the interpretation of two expressly interrelated agreements executed in 1972 (the "1972 Agreements" between Pantone, Inc. ("Pantone") and Esselte Letraset, Ltd. ("Letraset")). Pursuant to these agreements Pantone granted a license to use its trademark "Pantone" (the "Trademark Agreement") and transferred certain assets to Letraset (the "Purchase Agreement"). These agreements included: (i) a limited covenant by Pantone not to compete with Letraset and (ii) provided Letraset with a qualified right of first refusal concerning the use of the mark on new products developed by Pantone.

In 1987 Pantone entered into negotiations with Daler–Rowney Limited ("Daler–Rowney") concerning the licensing of the Pantone mark to Daler–Rowney for use on a line of products newly developed by Pantone. Upon notification of these negotiations in 1988, Letraset objected that such an agreement would violate the terms of the 1972 Agreements and threatened to seek an injunction. Pantone then initiated the present suit for declaratory relief, to which Letraset counterclaimed. The district court held that the proposed agreement between Pantone and Daler–Rowney violated the covenant not to compete, and accordingly, the district court enjoined Pantone and Daler–Rowney from executing the agreement. Pantone appealed from that decision. We affirm but on somewhat different grounds.

## BACKGROUND

### 1. The 1972 Agreements

The 1972 Agreements concern a group of products known collectively as the "Pantone Matching System" ("PMS"). PMS is a color communication, specification and reproduction system developed by Pantone in the 1960's that affords graphic artists a means to ensure color fidelity when their work is reproduced in final printed form. The system's key element is a copyrighted organizational scheme that matches particular colors with individual identification

numbers. This enables graphic artists to select from PMS publications number-coded, tear-out color chips to identify various art materials by color identification number.

As of 1972 Pantone had introduced three lines of products into the PMS color system: (i) Pantone Color Paper; (ii) Pantone Color/Tint Overlay; and (iii) Pantone Color Marker. The parties refer to these particular products, as well as any material changes in and material improvements of such products, as "GAM", an acronym for "graphic art materials." In addition, Pantone had also licensed a large number of printing ink manufacturers to produce ink corresponding to and identified by the PMS system.

Although PMS was a widely used method of specifying color in the graphic arts industry by 1972, Pantone's sales of commercial artist products at that time were relatively modest because of its limited distribution network. Letraset, on the other hand, had manufacturing facilities, an established worldwide marketing organization for commercial artist supplies, and experience in selling products comparable to PMS. Letraset's products were not tied to a color system, however. Letraset and Pantone thus possessed complementary assets and, consequently, they entered into the agreements in question in order to synergize Pantone's color system and Letraset's distributional organization.

Under Article II of the Trademark Agreement "Pantone ... grant[ed] to Letraset ... an exclusive license ... to use ... the mark 'PANTONE' (or any other Licensed Trademark) on or in connection with any GAM." Article I, in turn, defined GAM as "art material products [ (Pantone Color Paper, Pantone Color/Tint Overlay, Pantone Color Marker) ] displaying color or capable of color reproduction, in which said color displayed or reproduced is one of the colors of 'The Pantone Matching System.' " Under Article VI and Exhibit C, Letraset agreed to pay to Pantone a royalty amounting to 7½ percent of Letraset's net sales of GAM bearing the Pantone label.

Under Article IV(10), the Trademark Agreement provided a mechanism for dealing with "new products generally recognized as commercial artist supplies developed by Pantone during the term of [the] agreement." That provision states in pertinent part:

(a) Pantone shall first offer the exclusive right of manufacture and sale to Letraset.

(b) If Letraset fails to accept the offer described in subparagraph (a), above, within the six months following the making of such offer Pantone shall have the right to offer such manufacture and distributorship to any other party, but the product to be encompassed by such offer shall be in the same state of development that it was in when the offer was made pursuant to subparagraph (a) above; provided, however, that the offer of such distributorship and manufacture by Pantone to such other parties shall be upon business terms which shall not be more favorable than those proposed by Pantone pursuant to subparagraph (a) above.

We turn now to the provisions of the Purchase Agreement. It effected a transfer from Pantone to Letraset of the assets or the PMS manufacturing and distribution business. In Paragraph 28(2) of the Purchase Agreement, Pantone agreed to refrain from licensing or allowing anyone else to use the Pantone mark

(i) on or in connection with any products which are in direct competition with GAM,

(ii) on any products generally recognized as commercial artist supplies, except as provided in Article IV(10)(b) of the [Trademark Agreement].

The meaning of this provision and its relationship to Article IV(10) of the Trademark Agreement are central to the present dispute.

2. *The PCS System*

The 1972 Agreements benefit both parties. Sales of GAM increased from $665,000 in 1972 to approximately $19,000,000 in 1988. Pantone, meanwhile, has sought to expand its product line beyond the printing industry and into other fields such as archi-

tecture, interior design, beauty, fashion and industrial design. In 1982 Pantone began development of a new color communications system, the Pantone Professional Color System ("PCS"), which is designed to provide color selection in every non-print medium, including carpets, paints, fabric, textiles and cosmetics. In 1984, Pantone introduced its first PCS product, the Pantone Professional Color Guide ("PCG"). Pantone offered Letraset the right to be the exclusive distributor of the PCGs in return for an initial order for 10,000 books. Letraset rejected that proposal, and, instead, the parties agreed that Letraset would purchase 1,000 books on a non-exclusive basis. Pantone itself has sold 30,000 PCGs since 1985.

In addition to the PCGs, Pantone is now offering licenses to dye manufacturers that will permit them to develop dyes coordinated with the PCS color identification system. Finally, in order to complete the PCS system, Pantone is seeking to develop materials tied to the PCS color coding system that can be used by interior designers, fashion designers and architects.

In October 1984 Pantone approached Letraset with a proposal for Letraset to develop and market a PCS marker. Pantone told Letraset that Pantone intended to distribute the marker and other PCS products through home decorating centers and paint stores. In February 1985 Letraset informed Pantone that Letraset was not interested in creating a PCS marker because a PCS marker would compete with Letraset's existing line of PMS markers. Letraset also advised Pantone of its view that the 1972 Agreements prohibited the use of the Pantone label on such markers.

In July 1985 Letraset received reports that Pantone intended to distribute PCG matched paper through art supply stores. Letraset's director of planning, supply and development then sent a letter to Pantone stating that:

> On the question of [Pantone's] plans for coated paper matched to the PCG, [Letraset] had felt quite relaxed at the original idea that the product would be sold through home decorating and similar outlets, to be used as consumer colour samples. That did not seem to conflict seriously with [Letraset's] own marketing of the current range of Pantone by Letraset papers. If, however, [Pantone's] current plans are to distribute a range of PCG matched papers through art stores for use by designers, [Letraset] would feel that would be in conflict with the basic principles of our existing agreement and would fall into the same category as PCG matched markers. I may have misunderstood your current plans, but I think it is important that [Pantone] should be clear on this point.

Eventually, however, Pantone and Letraset reached an agreement in July 1986 whereby Pantone granted Letraset an exclusive license to sell PCS matched paper through art supply stores in both the United States and the Caribbean. In January of the next year the two parties reached a similar accord with regard to Italy. Finally, in the spring and summer of 1987, Pantone and Letraset discussed a possible Pan–European agreement to supersede the Italian Agreement. These negotiations failed, however, when the parties were unable to resolve a dispute involving trademark clauses.

Meanwhile, as of February 1987, Pantone had entered into discussions with Daler–Rowney, a British manufacturer of commercial artist supplies, concerning the possibility of Daler–Rowney's producing and distributing products coordinated to the PCS system. On February 22, 1988, Pantone informed Letraset that Pantone intended to grant Daler–Rowney a license to manufacture and distribute gouache and air brush color products based on the PCS system and to distribute Pantone Coatings Color Paper also geared to PCS. Letraset objected that such an arrangement would violate the 1972 Agreements.

Pantone nevertheless continued its negotiations with Daler–Rowney, and Letraset indicated its intent to seek an injunction. Pantone then commenced the present declaratory judgment action. Letraset counterclaimed.

In the district court, Pantone argued that the phrase "new products generally recognized as commercial artist supplies" as used in Article IV(10) of the Trademark Agreement and the phrase "any products generally recognized as commercial artist supplies" in Paragraph 28(2)(ii) of the Purchase Agreement are limited to materials included in the Trademark Agreement's definition of GAM. Because the definition of GAM is limited to specified products linked to the PMS system, the PCS products were not, in Pantone's view, within the scope of either the covenant not to compete or the right of first refusal. In seeking to distinguish PCS products from the definition of GAM, Pantone emphasized three characteristics of PCS: (i) PCS provides a wider range of colors than PMS; (ii) the colors in the PCS system are opaque or translucent, whereas the colors in the PMS system are transparent; and (iii) the PCS numbering system is distinct from the PMS numbering system.

Letraset's position was that Article IV(10) and Paragraph 28(2)(ii) were not limited to the Trademark Agreement's definition of GAM but applied to the entire genre of "commercial artist supplies" as that term is understood in the trade. In Letraset's view, as reflected in its counsel's opening statement, Pantone could develop "new products so long as the rights of Letraset are protected by either a right of first refusal *or, absent such a development,* a prohibition against use of the trademark Pantone on commercial artist supplies" (emphasis added).

Although the district court held that the language of the 1972 Agreements was unambiguous, it permitted, at Pantone's request, the introduction of extrinsic evidence relating to the proper interpretation of "products generally recognized as commercial artist supplies." After hearing the testimony and reviewing the documents, the district court rejected Pantone's position and concluded that "[t]he weight of the credible evidence adduced in the negotiating history reinforces [the position] that the design and object of the Agreements was the same as what the language and content of the two clauses, if considered alone, would indicate." *Pantone, Inc. v. Esselte Letraset Ltd.,* 691 F.Supp. 768, 774 (S.D.N.Y.1988). Noting that it was "unnecessary to enter into a debate of the scope of what constitutes 'any products generally recognized as commercial artist supplies,' since the gouache and air brush color [products] are undeniably such supplies," *id.,* the district court found that "the proposed licensing of the trademark 'PANTONE' [to Daler–Rowney] for use on gouache and air brush color violates the covenant by Pantone contained in [Paragraph 28(2)(ii) of the Purchase Agreement.]" *Id.* at 780. Consequently, Pantone was enjoined from executing its agreement with Daler–Rowney. For reasons stated *infra,* we agree.

The district court also found that the covenant not to compete prohibited any licensing of the Pantone mark to anyone but Letraset for "any products generally recognized as commercial artist supplies" interpreted in its broad sense, i.e. encompassing more than GAM, whether or not a right of first refusal had been accorded to Letraset. It arrived at this conclusion notwithstanding Letraset's own considerably narrower view of its rights by interpreting Article IV(10)'s reference to *"new* products generally recognized as commercial artist supplies" to be limited to new GAM. For reasons stated *infra,* we disagree with the district court. Nevertheless, although Pantone approached Letraset with various proposals, it is clear that the formalities required under the right of first refusal provisions were never observed, and we therefore affirm.

## DISCUSSION

■ Pantone's primary contention is that the district court erred when it held the contested language of the 1972 Agreements to be unambiguous. "The determination of whether a contract term is ambiguous is a threshold question of law for the court." *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987); *see also Tokio Marine and Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980); *Sutton v.*

*East River Savings Bank,* 55 N.Y.2d 550, 554, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982). We may therefore review the district court's resolution of this issue de novo. *See Walk–In Medical Centers,* 818 F.2d at 264.

■ Under New York law,[1] [a]n "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968); *see also Fox Film Corp. v. Springer,* 273 N.Y. 434, 8 N.E.2d 23 (1937). Applying this standard, we believe Pantone's claim that the phrase "generally accepted as commercial artist supplies" has a meaning other than its plain meaning must fail. Although it had ample opportunity to do so, Pantone offered no evidence that industry custom excluded gouache and air brush colors from the field of products "generally accepted as commercial artist supplies." Instead, it pursued only the claim that the circumstances peculiar to the 1973 Agreements limited the scope of the contested language to those products defined by the Agreements as GAM.

In any event, the district court allowed, at Pantone's request, the introduction of extrinsic evidence concerning the parties' intentions as to the meaning of "products generally accepted as commercial artist supplies." That evidence also weighs heavily against Pantone's claim.

Pantone's principal witness on this issue was Lawson F. Bernstein, an attorney who acted as Pantone's chief negotiator in the drafting of the 1972 Agreements. Mr. Bernstein testified that the term "generally recognized as commercial artist supplies" was used by the parties as "a general rubric to describe potential GAMS." GAMS, in turn, were said by Mr. Bernstein

to be limited to those products that "incorporate[d] the Pantone Matching System and use[d] its color expression." Mr. Bernstein failed to support this claim with contemporaneous records. Nor did he provide a credible explanation for the fact that the parties employed the term GAM in Article IV(9)(a), (d), (f) and (g), but chose, instead, to employ the term "generally recognized as commercial artist supplies" in Article IV(10).

In contrast, Letraset's primary witness, Jeremy Waters, testified that the parties intended the phrase "generally recognized as commercial artist supplies" to "cover[ ] any commercial artist supplies, with or without color." More specifically, Mr. Waters explained that the phrase "generally recognized" was adopted in order to provide the parties with an objective test to determine whether a product fell within the scope of the 1972 Agreements.

In addition, Mr. Waters advanced a cogent explanation for the parties' adoption of the pertinent language. According to Waters, this language was adopted because "[Letraset was] very concerned that if [it] built the Pantone name as a strong, very strong brand in commercial artist supplies, that that could be an invitation if [Letraset] didn't have protection for Pantone to offer to license its name to any company that might be seeking to compete with [Letraset] or indeed to compete with [Letraset] across the broad range of commercial art supplies that Letraset sold at that time and would sell in the future."

This testimony was, moreover, bolstered by contemporaneous documentation. For example, an internal Letraset memorandum dated August 15, 1972 and written by Mr. Waters summarized the terms of the proposed agreement with Pantone. It stated that, under the terms tentatively agreed to, "Pantone would not manufacture for sale any other artists' materials without Letraset's approval, whether or not linked to Pantone's color system." Similarly, in a compilation of annotations to a "heads of agreement" dated August 30, 1972, a Letraset reviewer observed that the proposed

---

**1.** The 1972 Agreements state that New York law governs their interpretation.

definition of art materials "[did] not satisfactorily limit Pantone's ability to introduce art materials competitive to Letraset, which are not based on color, e.g., a dry transfer. The intention is that it should." Finally, in a later internal memo dated October 20, 1972, Waters explained that under the terms of the proposed agreement "[Letraset] eliminate[s] Pantone as a future competitor in commercial art materials at least until [Letraset chooses] to terminate the agreement.... [It] also obtain[s] exclusive rights to the name 'Pantone' in the art material field and Pantone [is] enjoined from competing with [Letraset] on dry transfers."

In rejecting Pantone's claim, the district court was thus able to rely both on the unambiguous language of the contract and the extrinsic evidence of the intentions of the parties as well. We therefore agree that the term "products generally recognized as commercial artist supplies" is not restricted to the Trademark Agreement's definition of GAM.

This conclusion does not, however, end our review of the district court's interpretation of the 1972 Agreements. As noted, the district court found that the parties intended the phrase *"any* products generally recognized as commercial artist supplies" (emphasis added) to include the proposed PCS products. It also concluded, however, that those products were not *"new* products generally recognized as commercial artist supplies" (emphasis added) that might be marketed under the Pantone mark after Letraset had been accorded its right of first refusal. Instead, the district court read the clause beginning with "new products" to be limited to new GAM and concluded that Pantone could not license its mark to be used on commercial artist supplies as broadly defined whether or not the right of first refusal had been accorded to Letraset. We disagree with this reading of the two contracts.

The only support in the record for the district court's conclusion in this respect are Letraset's internal memoranda quoted above. The language of the contracts, testimony given by Waters (author of most of the Letraset internal memoranda), statements by Letraset's counsel, and pleadings

filed by Letraset in this case are all flatly to the contrary. As a result, we believe the district court's findings are clearly erroneous.

Certainly, the district court's interpretation of the contracts is incongruous in that it gives the words "products generally recognized as commercial artist supplies" one meaning when used in Article IV(10) of the Trademark Agreement and another when used in Paragraph 28(2) of the Purchase Agreement. In light of the fact that Paragraph 28(2) explicitly incorporates Article IV(10), giving different meanings to identical language is also inconsistent with the district court's view that the contractual language has a plain meaning. Nor is this inconsistency resolved by the use of the adjective "new" in Article IV(10) and the adjective "any" in Paragraph 28(2). The all-encompassing word "any" in no way excludes items that might also be described as "new", and the language of the contracts thus plainly allows Pantone to license its mark on "new" products once the right of first refusal has been accorded.

Most important, Letraset's binding judicial admissions, and evidentiary admissions, contradict the district court's ruling. The opening statement by Letraset's counsel at trial quoted above clearly indicated that Letraset was not challenging Pantone's right to license its mark on "new" commercial artist supplies once the right of first refusal had been accorded. In addition, in Paragraphs 17 and 18 of its Counterclaim, Letraset stated:

(i) Pantone's obligations to Letraset included:

undertaking not to use, or to license or otherwise allow anyone else to use, the trademark PANTONE in two instances: (i) on or in connection with any products in direct competition with GAM, (ii) on any products generally recognized as commercial artist supplies (except new products developed by Pantone and which Letraset had rejected in the exercise of its right of first refusal[;]

and (ii): Except for Pantone-developed products offered to and rejected by Letraset, Pantone covenanted not to license use of the mark PANTONE on or in connection with products generally rec-

ognized as commercial artist supplies. Since 1972, Pantone has never made any offer of a new developed product to Letraset under Article IV(10).

Letraset's proposed findings of fact and conclusions of law asserted that:

> Pantone is prohibited under [the covenant not to compete only from using the mark PANTONE, only on any product generally recognized as a commercial artist supply, and then only (i) if the product directly competes with GAM or (ii) if Pantone fails to offer Letraset a right of first refusal on a Pantone-developed product. Pantone is not prohibited from selling products generally recognized as commercial artist supplies which do not bear or use the trademark
>
> . . . .

Paragraph 27 of Letraset's Counterclaim identifies three categories of products intended to be sold pursuant to the proposed Pantone/Daler–Rowney agreement and alleged to be in violation of the 1972 Agreements. These are the gouache, air brush colors and PCS paper. With regard to the gouache and air brush colors, the only illegality alleged is the failure to offer Letraset the right of first refusal. Letraset's proposed findings and conclusions are in accord and concede that these products do not fall within the "direct competition" prohibition but only that they should have been offered first to Letraset. Finally, Waters testified that "clauses IV(9) and IV(10) [, the right of first refusal provisions,] were addressing the same broad range of products as 28(2) [, the covenant not to compete.] . . . ." He further stated that "new products" referred to "any product which was not [at that time] part of the definition of GAMs . . . ."

Letraset thus made repeated assertions that Pantone could license its mark to third parties under Paragraph 28(2) after offer-

ing Letraset the right of first refusal, and the district court's conclusion to the contrary is clearly erroneous. However, the Daler–Rowney agreement must still be enjoined with regard to the proposed gouache and air brush colors because of the failure to comply with the first refusal provision.

We add one note. Paragraph 28(2)(i) of the Purchase Agreement prohibits licensing of the mark as to products "in direct competition with GAM" whether or not a right of first refusal has been accorded. Letraset has from the beginning asserted that the PMS Coatings Color Paper was in direct competition with GAM. If so, then licensing of the Pantone mark to Daler–Rowney with regard to those products would violate the covenant not to compete.[2] In view of its disposition of the case, the district court made no findings on this issue, and it thus remains open for purposes of further proceedings.

Affirmed.

---

**2.** We briefly discuss Pantone's claim that the covenant not to compete violates public policy. Under New York law, if there is a transfer of good will, an accompanying covenant not to compete is valid unless it is "more restrictive than is reasonably necessary . . . ." *Foyer Key Sung v. Ramirez,* 121 Misc.2d 313, 315, 467 N.Y.S.2d 486, 488 (Sup.Ct.1983). In light of our interpretation of the right of first refusal, the

covenant not to compete is reasonable. Letraset has invested time and money in developing the Pantone mark and is entitled to some protection. Neither the public nor Pantone is unreasonably injured by the covenant.

Finally, we affirm the district court's holding that Letraset is estopped from challenging Pantone's distribution of PCS paper through home decorating centers.