The CITY OF NEW YORK, The State of New York, The People of the State of California ex rel. John K. Van de Kamp, Attorney General, The City of Los Angeles, The City of Chicago, Dade County, Florida, The U.S. Conference of Mayors, The National League of Cities, The League of United Latin American Citizens, The National Association For the Advancement of Colored People, Marcella Maxwell, Donald H. Elliott, John Mack, Olga Morales, Timothy W. Wright III, Raymond G. Romero, Antonio Gonzales, and Athalie Range, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE, Robert A. Mosbacher, as Secretary of the United States Department of Commerce, Michael R. Darby, as Under Secretary for Economic Affairs of the United States Department of Commerce, Bureau of the Census, Barbara Everitt Bryant, as Director of the Bureau of the Census, George Bush, as President of the United States, and Donald K. Anderson, as Clerk of the United States House of Representatives, Defendants.

No. 88 CV 3474.

United States District Court, E.D. New York.

June 7, 1990.

Victor A. Kovner, Corp. Counsel of The City of New York, New York City, for plaintiff The City of New York.

Robert Abrams, Atty. Gen. of State of N.Y. by Sanford M. Cohen, Asst. Atty. Gen. of State of N.Y., New York City, for plaintiff State of N.Y.

John K. Van de Kamp, Atty. Gen. of State of Cal. by Fredric D. Woocher, Sp. Counsel to Atty. Gen., Los Angeles, Cal., for plaintiff People of State of Cal. ex rel. John K. Van de Kamp, Atty. Gen.

Cravath, Swaine & Moore by Robert S. Rifkind, New York City, for all plaintiffs except State of N.Y. and People of State of Cal. ex rel. John K. Van de Kamp, Atty. Gen.

Arnold & Porter, Sp. Counsel to City of New York by Peter L. Zimroth (Stein, Zauderer, Ellenhorn, Frischer & Sharp, of counsel), New York City, for plaintiffs.

James K. Hahn, City Atty. of City of Los Angeles, for plaintiff City of Los Angeles.

Julie Downey, Asst. City Atty., Jessica F. Heinz, Deputy City Atty., Los Angeles, Cal.

Herbert Henderson, Acting Gen. Counsel of N.A.A.C.P., Baltimore, Md., for plaintiff N.A.A.C.P.

Edward A. Hailes, Jr., Asst. General Counsel, Baltimore, Md.

Kelly Walsh, Corp. Counsel of City of Chicago, Chicago, Ill., for plaintiff City of Chicago.

John Satalic, Sp. Deputy Corp. Counsel, Chicago, Ill.

Clarence A. West, City Atty. of City of Houston, Tex., for plaintiff City of Houston.

Susan Taylor, Asst. City Atty., Houston, Tex.

Robert A. Ginsburg, Dade County Atty., Miami, Fla., for plaintiff Dade County, Fla.

Gerard Lavery Lederer, Washington, D.C., for plaintiff U.S. Conference of Mayors.

Gladys Daniels, Washington, D.C., for plaintiff National League of Cities.

Ruben Bonilla, Corpus Christi, Tex., Gen. Counsel of The League of United Latin American Citizens for plaintiff The League of United Latin American Citizens.

Ruben Castillo, E. Richard Larson, Mexican American Legal Defense & Education Fund, Chicago, Ill., for plaintiff Raymond G. Romero.

Stuart M. Gerson, Asst. Atty. Gen., Andrew J. Maloney, U.S. Atty., Stephen E. Hart, Michael Sitcov, William DeMaria, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Census-taking has never been easy, and has rarely received favorable press. King David learned this the hard way. In First Samuel, the King directed his Census Bureau, one Joab, to "go through all the tribes of Israel From Dan to Bersabee, and number ye the people that I may know the number of them." When Joab had reluctantly counted as far as 800,000, David realized that, in some eyes, his task might be regarded as hubris on the scale of the Tower of Babel. He repented, lamenting: "I have sinned very much in what I have done; But I pray thee O Lord, to take away the iniquity of thy servant because I have done exceedingly foolishly." The Lord turned a deaf ear for he sent David a pestilence and 70,000 died.

Caesar Augustus fared little better with David's descendant, Joseph, who, it will be recalled, had to travel with Mary to Nazareth for a census count, only to find there was no room for his tiny family in the inn. Christianity thus was founded in a stable— thanks to the census—and, according to Gibbon's *Decline and Fall of the Roman Empire*, it was Christianity that toppled the empire of the Caesars.

Colonial Americans seemed to have heeded these lessons, for no government enumeration of the colonies was ever undertaken. The Founding Fathers, however, were persuaded that the efficient function-

ing of a new democracy required a census. The original Constitution, therefore, required a simple head count of all Americans every ten years.[1] The task of conducting the first census was given, not surprisingly, to a patriot who had skipped the Constitutional Convention, Thomas Jefferson. Americans resisted on a grand scale, and matters have not improved in two hundred years.

For whatever reasons it goes against the American grain to submit to counting. In the 1980 count Census Bureau officials concede that they missed at least three million people. Statisticians and demographers claim this is a modest assessment. In any event, no one claims that the count is precise. Indeed, shots rang out as census takers recently approached one building in Brooklyn, thereby aborting further attempts to count that building's occupants.

Various statistical and sampling techniques have been employed, at least to some extent, by the Bureau of the Census to arrive at as accurate a figure as humanly possible, although the Bureau largely adheres to what it refers to as an "actual enumeration." Therein lies the rub, and this lawsuit. Plaintiffs claim that the actual enumeration the Bureau has used in the past and originally intended to use in the 1990 census is skewed to underestimate large blocks of minorities, with most of the undercounting occurring in the large urban areas. If this turns out to be true, the inevitable consequence will be under-representation in the Congress, and under-allocation of government revenues, grants, programs and the like. Plaintiffs argue that the 1990 census should be statistically adjusted to compensate for this "differential undercount" of minorities, if such an adjustment results in the most accurate census practicable.

## FACTS

Plaintiffs began this suit in November 1988, seeking to enjoin the conduct of the 1990 census. Extensive negotiations were conducted in the summer of 1989, culminating on July 17, 1989 with an eleventh-hour stipulation (the "Stipulation") of the parties. The short-term effect of that Stipulation was to moot plaintiffs' motion for a preliminary injunction, halting the immediate course of the 1990 decennial census; the long-term effect of the Stipulation remains to be seen.

Plaintiffs now return to the Court, alleging defendants have violated that Order and Stipulation. Plaintiffs seek two-fold relief. First, plaintiffs ask for a declaratory judgment, declaring that a statistical adjustment of the federal census does not violate the Constitution or 13 U.S.C. § 195.[2] Second, plaintiffs seek a supplemental order from the Court: (1) invalidating the "guidelines" promulgated under the Stipulation for determining whether a practicable statistical correction would increase census accuracy; (2) ordering defendants to adjust the census, unless they demonstrate to the Court that the original enumeration is more accurate or that some other compelling reason prevents a statistical adjustment; and (3) directing defendants to fulfill their obligations to the Special Advisory Panel established under the terms of the Stipulation.

Defendants reject all of plaintiffs' claims as meritless, and they argue that it is im-

1. Article I, Section 2, Clause 3 of the original Constitution provides:

Representatives and direct Taxes shall be apportioned among the several States which may be included within the Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

Section 2 of the Fourteenth Amendment further directs:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.

2. The statute provides:

Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.

proper for the Court to entertain such imagined grievances at this juncture.

Defendants first argue that plaintiffs' claims for a declaratory judgment and for a supplemental order are not ripe for review. Essentially, defendants argue that, although the "guidelines" promulgated pursuant to the Stipulation are final, the Secretary of Commerce (the "Secretary") has not yet applied them. Thus, the Secretary may yet act under the guidelines to adjust the census in a manner that accords with plaintiffs' requests, thereby obviating the need for further relief. Defendants also contend that, since the Secretary has yet to decide whether an adjustment is constitutional, there is no decision ready for review.

Additionally, even if plaintiffs' claims were ripe, according to defendants, the decision whether to adjust is a political question. If so, plaintiffs' claims should be dismissed as nonjusticiable. Finally, if judicial review is proper and some form of relief is available at this time, defendants maintain that the specific relief requested is excessive and wholly unwarranted.

*The Stipulation*

Under the Stipulation, the Secretary retains all authority and decision-making power, "including without limitation the decision whether or not to adjust the 1990 Decennial Census." Stip. at 1. Defendants forthrightly concede in the Stipulation that a post-enumeration survey ("PES") and other adjustment operations defendants deem necessary will be conducted for the express purpose of achieving the most accurate count practicable.

To insure that this self-imposed mandate will be carried out properly, the Stipulation establishes two linchpin provisions. First, "[d]efendants agree that the Department will promptly develop and adopt guidelines articulating what defendants believe are the relevant technical and nontechnical statistical and policy grounds for decision on whether to adjust the 1990 Decennial Census population counts." Stip. at 3. In addition,

Defendants shall establish ... an independent Special Advisory Panel (the "Panel") to advise the defendants on all matters relevant to the implementation of this Stipulation and, in particular, and without limitation, the guidelines ..., the application and achievement of the guidelines, the expedition with which defendants are proceeding toward decision on adjustment, and plans and schedules for the implementation of the Census and the PES in a manner that will result in the most accurate final census data at the earliest practicable time.

Stip. at 4–5.

Plaintiffs believe that defendants have failed to fulfill their explicit obligations under each provision.

## DISCUSSION

### I. POLITICAL QUESTION

Pursuant to the Stipulation, "plaintiffs reserve the right to challenge any of the guidelines ... adopted, omitted, implemented, or announced in connection with or arising out of this Stipulation." Stip. at 7. Despite this language, defendants maintain that a challenge to the guidelines presents a nonjusticiable political question.[3]

Some actions of the Executive and some interaction between the executive and legislative branches are, in an Article III sense, inappropriate for judicial intrusion. *Holtzman v. Schlesinger*, 484 F.2d 1307, 1309 (2d Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). As a function of separation of powers, cases which raise a political question are nonjusticiable and, by constitutional mandate, preclude judicial intervention. *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). While sensitive to such limitations, this Court is satisfied that a challenge to the final guidelines, even as they relate to the Secretary's yet unmade decision on a census adjustment, does not present a political question.

---

3. Generally, a stipulation estops a party from subsequently asserting an inconsistent position. *Gall v. South Branch Nat'l Bank*, 783 F.2d 125,

127 (8th Cir.1986). Giving defendants the benefit of the doubt on consistency, however, the Court will rule on the merits of the objection.

The identical argument against justiciability arose in litigation, also brought by the City and State of New York, concerning adjustment of the 1980 census. *Carey v. Klutznick*, 508 F.Supp. 404 (S.D.N.Y. 1980). The district court, rejecting defendants' suggestion of a political question, found:

> While *Carey v. Klutznick* involves a challenge to the census, and not precisely a challenge to congressional redistricting [as in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)], the former provides the foundation for apportionment and redistricting and, therefore, the precedents sustaining challenges to congressional redistricting should afford a predicate for finding the claims before the court justiciable.

508 F.Supp. at 411. The court therefore concluded that "both precedent and the intent of the Framers warrant the conclusion that the issues presented [in challenging the census enumeration] are justiciable." *Id.* The Second Circuit affirmed, adding, "We fully recognize that there is no power to review agency action that is 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), but this is not one of those 'rare instances' where that exception may be invoked." *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir.1980) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)). The Second Circuit thereafter stood by this finding of justiciability, choosing not to reexamine the issue. *Carey v. Klutznick*, 653 F.2d 732, 737 & n. 18 (2d Cir.1981).

The justiciability of plaintiffs' claim is established by precedent not only in this circuit, but in other jurisdictions as well. *City of Willacoochee v. Baldrige*, 556 F.Supp. 551, 557 (S.D.Ga.1983); *City of Philadelphia v. Klutznick*, 503 F.Supp. 663, 674 (E.D.Pa.1980); *Young v. Klutznick*, 497 F.Supp. 1318, 1326 (E.D.Mich. 1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982).

## II. RIPENESS

Defendants argue in the alternative that the Court lacks authority to hear plaintiffs' grievances at this time because none of plaintiffs' claims are ripe for review. Defendants declare unripe plaintiffs' claim that the final census guidelines violate the Stipulation, as well as plaintiffs' demand for a declaratory judgment on the legality and constitutionality of an adjusted census.

A matter is ripe when there is "a genuine need to resolve a real dispute." 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3532.1 at 114 (1984). As a general proposition, ripeness is "very much a matter of practical common sense." *Continental Air Lines, Inc. v. CAB*, 522 F.2d 107, 124 (D.C.Cir.1974) (en banc) (citing *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). More specifically, however, a two-part test governs the issue because "ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 190–91, 103 S.Ct. 1713, 1716, 75 L.Ed.2d 752 (1983) (quoting *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515).

### A. *The Guidelines*

Defendants concede the guidelines "are final as far as they go." Def. Mem. in Opp. at 11. When agencies are involved, the administrative action must first be sufficiently final before it is fit for review. *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515; *see also In re Combustion Equip. Assoc., Inc.*, 838 F.2d 35, 38 (2d Cir.1988). A determination of fitness also includes inquiry into whether the issue is purely a legal one, or whether a court could better resolve the issue in a more concrete setting, i.e., the context of a specific attempt to apply the agency decision. *See In re Combustion Equip. Assoc., Inc.*, 838 F.2d at 38 (citing *Gardner v. Toilet Goods Assoc.*, 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967)); *Ciba–Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C.Cir.

1986); *Riley v. Ambach*, 668 F.2d 635, 642 (2d Cir.1981).

If the issue surrounding agency action is a purely legal one "in which no further facts need be developed to facilitate a proper judicial decision, a *final* agency action may be fit for review even though it has never been applied or enforced by the agency in a concrete setting." *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1217 (D.C.Cir.1984) (emphasis in original). In fact, when final agency action involves a purely legal question, there is a threshold assumption of suitability for judicial determination. *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985).

The second aspect in evaluating ripeness is the hardship involved in withholding court consideration. Contested agency action must have an impact on the challenging parties "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. at 1517; *see Toilet Goods Assoc. v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).

■ It is quite clear that, under the facts of this case, the finality of the promulgated guidelines makes them ripe for judicial review. Unquestionably, the only outstanding issue is a legal one, namely, whether the guidelines as finally drafted satisfy defendants' obligations under the Stipulation. No further facts or applications are necessary to give this controversy sharper focus.

This Court is aware that a window of opportunity will close with time, imposing direct hardship on plaintiffs. The final guidelines articulate the "grounds for decision on whether to adjust the 1990 Decennial Census population counts." Stip. at 3. That decision admittedly results from an ongoing process, one shaped and matured by the progress of the post-enumeration statistical survey. Moreover, the PES is fast approaching, scheduled to commence at the end of June.

Defendants are obligated to determine whether an adjustment, based upon PES results, satisfies the guidelines. *Id.* Most critically, in the event defendants decide not to adjust, defendants bear the burden to explain their decision in a detailed statement of reasons, pointing out which guidelines were not met. *Id.* at 4.

In this sense the guidelines, as mutually intended, lay the foundation and establish the framework for a principled decision by the Secretary. The right to challenge the guidelines, as discussed *supra*, was expressly reserved by plaintiffs in the Stipulation. Plaintiffs clearly have a right to prove, if they can, fatal cracks in the foundation; and they have that right now. The resulting hardship of postponing that challenge until after the Secretary's decision is an indefensible temporizing.

A stipulation, so ordered by the Court, is a contract negotiated between parties. *Berger v. Heckler*, 771 F.2d 1556, 1567 (2d Cir.1985); *see also United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *Dotson v. HUD*, 731 F.2d 313, 318 (6th Cir.1984). The failure of an agency to act, in breach of a stipulation, poses a threat "sufficiently real and immediate to amount to an existing controversy entitling [plaintiffs] to enforce the decree." *Berger v. Heckler*, 771 F.2d at 1564.[4]

### B. *Declaratory Judgment*

Whether plaintiffs' request for a declaratory judgment is ripe is more troublesome. Declaratory judgment actions should be entertained "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir.1986) (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir.1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686

---

**4.** For these reasons the Court also finds the Special Advisory Panel issues, *infra*, ripe for review.

(1970) (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)).

The dispute involved must not be hypothetical or academic, or a request in the abstract for an advisory opinion; it must be "a definite, concrete controversy of sufficient immediacy to warrant the issuance of a declaratory judgment." *Broadview Chem. Corp.*, 417 F.2d at 1000; *see generally Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937).[5] Even when a declaratory judgment claim is justiciable, it is well settled that the decision to exercise declaratory jurisdiction rests with the discretion of the trial court. *Broadview Chem. Corp.*, 417 F.2d at 1000; *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 505 (2d Cir. 1968).

According to plaintiffs, guideline five[6] prompted a swift and immediate request for declaratory relief. The Court sympathizes with plaintiffs' concern that, in raising the specter of doubt, defendants undermine a legitimate effort to achieve the most accurate census practicable through adjustment. Something not worth doing at all is certainly not worth doing well. The Court is confident, however, that it can allay at least some of those fears.

It is no longer novel or, in any sense, new law to declare that statistical adjustment of the decennial census is both legal and constitutional. This Court has already recognized that Article I, § 2 "require[s]" that the census be as accurate as practicable." *City of New York v. Dep't of Commerce*, 713 F.Supp. 48, 50 (E.D.N.Y.1989). *See also Karcher v. Daggett*, 462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983) (congressional districts must be apportioned to achieve equal population "as nearly as is practicable"); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11

L.Ed.2d 481 (1964); *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980).

Confronted with mirrored claims of illegality and unconstitutionality, the trial court in *Carey v. Klutznick, supra,* concluded "that defendants['] constitutional and statutory objections concerning the impropriety of employing statistical adjustments to compensate for the undercount [are] without merit." 508 F.Supp. 415. Decisions by other courts arrive at the same result. *See, e.g., City of Philadelphia v. Klutznick*, 503 F.Supp. 663, 679 (E.D.Pa.1980) (holding that "the Constitution permits the Congress to direct or permit the use of statistical adjustment factors in arriving at the final census results used in reapportionment" and also "that the Census Act permits the Bureau to make statistical adjustments in the headcount"); *Young v. Klutznick*, 497 F.Supp. 1318, 1332–33 (E.D.Mich.1980) ("[N]othing in the Constitution ... prohibits adjustment techniques."), *rev'd on other grounds,* 652 F.2d 617 (6th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); *see also Cuomo v. Baldrige*, 674 F.Supp. 1089, 1096 n. 13 (S.D.N.Y.1987).

■ This Court concludes that because Article I, § 2 requires the census to be as accurate as practicable, the Constitution is not a bar to statistical adjustment. I am similarly persuaded by the reasoning of *Carey v. Klutznick, supra,* as affirmed by the Second Circuit, that "in the area of apportionment where important constitutional rights are at stake, the Census Bureau may utilize sampling procedures but only in addition to more traditional methods of enumeration." 508 F.Supp. at 415 (citing *Young v. Klutznick*, 497 F.Supp. at

---

**5.** The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force of a final judgment or decree

and shall be reviewable as such. 28 U.S.C. § 2201; *see also* Fed.R.Civ.P. 57.

Where there is a substantial controversy between the parties having adverse legal interests of sufficient immediacy, a case is ripe for declaratory relief. *Employers Ass'n v. State of New Jersey*, 601 F.Supp. 232 (D.C.N.J.), *aff'd,* 774 F.2d 1151 (3rd Cir.1985).

**6.** See, *infra,* text accompanying note 9.

1318).[7]

That said, it does not follow that any and all forms of statistical adjustments will be sanctioned. General principles, as Holmes observed, do not decide concrete cases. And this is not the occasion to prescribe what adjustments may or may not be made. The PES has not yet begun and the final form of the suggested statistical adjustment for 1990 remains to be seen. Reason and common sense dictate that, while constitutional and legal concerns will shape the end product, they should in no way hamper the effort. The concept of statistical adjustment is wholly valid, and may very well be long overdue. Whether it has been done legally and constitutionally can only be determined after the Secretary has decided how he wishes to adjust, if at all.

## III. BREACH OF A STIPULATION

Stipulations so ordered by the Court, like consent decrees, are a hybrid. Being at once both contracts and judicial orders, "they are construed largely as contracts, but are enforced as orders." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985); *see United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975); *SEC v. Levine*, 881 F.2d 1165, 1178 (2d Cir.1989); *Schurr v. Austin Galleries*, 719 F.2d 571, 574 (2d Cir.1983). The Court retains continuing jurisdiction over the decree to supervise and enforce it. *Berger v. Heckler*, 771 F.2d at 1568; *Wilder v. Bern-*

*stein*, 645 F.Supp. 1292, 1308 (S.D.N.Y. 1986), *aff'd*, 848 F.2d 1338 (2d Cir.1988).

The Court discerns the meaning of such decrees from the four corners of the document. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971); *SEC v. Levine*, 881 F.2d at 1179; *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 38 (2d Cir.1989). A court construing a stipulation is "not entitled to expand or contract the agreement of the parties as set forth in the consent decree." *Berger v. Heckler*, 771 F.2d at 1568; *see also Taitt v. Chemical Bank*, 810 F.2d 29, 33 (2d Cir.1987) ("Accordingly, we view the order ... as facilitating and effectuating, but not expanding, the intent of the parties as found in the four corners of the consent decree."); *SEC v. Levine*, 881 F.2d at 1179.

Deference is paid to the explicit language and the plain meaning of language in the decree, including normal usage of the words selected. *Berger v. Heckler*, 771 F.2d at 1568. The Court may not, in any case, "participate in any bargaining for better terms." *Plummer v. Chemical Bank*, 668 F.2d 654, 655 n. 1 (2d Cir.1982).

Moreover, "[e]xtrinsic evidence ... may generally be considered *only* if the terms of the judgment, or if the documents incorporated in it, are ambiguous." *SEC v. Levine*, 881 F.2d at 1179 (emphasis added); *see also Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d at 38. None of the parties have argued that the terms of the Stipulation are ambiguous.[8]

---

**7.** In so concluding, the district court considered 13 U.S.C. sections 141(a) and 195 *in pari materia*, nullifying neither provision and giving effect and meaning to both. 508 F.Supp. at 415. 13 U.S.C. § 141(a) provides:

> The Secretary shall ... take a decennial census of population ... in such form and content as he may determine, including the use of sampling procedures and special surveys. In connection with any such census, the Secretary is authorized to obtain such other census information as necessary.

**8.** Whether or not the "contract language" of a settlement stipulation is ambiguous is a question of law for the Court. *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990); *Curry Road Ltd. v. Kmart Corp.*, 893

F.2d 509, 511 (2d Cir.1990); *Pantone Inc. v. Esselte Letraset, Ltd.*, 878 F.2d 601, 605 (2d Cir. 1989); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 & n. 9 (2d Cir.1984) (disagreeing with trend toward making contextual inquiry to determine whether language is ambiguous).

> Language is ambiguous if it is:
> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Pantone*, 878 F.2d at 606 (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968); *Burger King*, 893 F.2d

## A. *The Guidelines*

Under the agreed terms of the Stipulation, defendants promulgated the following eight final guidelines: [9]

1. The Census shall be considered the most accurate count of the population of the United States, at the national, state, and local level, unless an adjusted count is shown to be more accurate. The criteria for accuracy shall follow accepted statistical practice and shall require the highest level of professional judgment from the Bureau of the Census. No statistical or inferential procedure may be used as a substitute for the Census. Such procedures may only be used as supplements to the Census.

2. The 1990 Census may be adjusted if the adjusted counts are consistent and complete across all jurisdictional levels: national, state, local, and census block. The resulting counts must be of sufficient quality and level of detail to be *usable* for Congressional reapportionment and legislative redistricting, and *for all other purposes and at all levels for which census counts are published.*

3. The 1990 Census may be adjusted if the estimates generated from the prespecified procedures that will lead to an adjustment decision are shown to be more accurate than the census enumeration. In particular, these estimates must be shown to be robust to variations in reasonable alternatives to the production procedures, and to variations in the statistical models used to generate the adjusted figures.

4. The decision whether or not to adjust the 1990 Census should take into account the effects such a decision might have on future census efforts.

5. Any adjustment of the 1990 Census may not violate the United States Constitution or Federal statutes.

6. There will be a determination whether to adjust the 1990 Census when sufficient data are available, and when analysis of the data is complete enough to make such a determination. If sufficient data and analysis of the data are not available in time to publish adjusted counts by July 15, 1991, a determination will be made not to adjust the 1990 Census.

7. The decision whether or not to adjust the 1990 Census shall take into account the potential disruption of the process of the orderly transfer of political representation likely to be caused by either course of action.

8. The ability to articulate clearly the basis and implications of the decision whether or not to adjust shall be a factor in the decision. The *general rationale* for the decision will be clearly stated. The technical documentation lying behind the adjustment decision shall be in keeping with professional standards of the statistical community.

Most of these guidelines are embellished with an accompanying "explanation". Plaintiffs argue that the guidelines violate the Stipulation, challenging that they do not set forth technical standards for decision, contain a built-in bias against adjustment and permit the Secretary to base his decision on impermissible factors.

 The operative language of the Stipulation provides that the Department of Commerce would develop and adopt "guide-

---

at 527; *see also Adipietro v. Chubb Life American,* 736 F.Supp. 29, 33 (E.D.N.Y.1990). In reviewing the critical language of the Stipulation calling for the promulgation of agency guidelines and the establishment of a Special Advisory Panel, I conclude the Stipulation is not ambiguous.

9. Pursuant to the Stipulation defendants were required to publish proposed guidelines in the Federal Register by December 10, 1989 with a request for comments. Final guidelines were to be published in the Federal Register by March 10, 1989. Stip. at 3.

Defendants published twelve proposed guidelines with substantial "explanation" sections and a request for comments. Proposed Guidelines For Statistical Adjustment of 1990 Census, 54 Fed.Reg. 51,002 (Dec. 11, 1989). A second notice announced an extension to February 2, 1990 as the last date for comments. 55 Fed.Reg. 2,397 (Jan. 24, 1990). Final guidelines were published March 15, 1990. Defendants again included accompanying explanations, summarized the comments received and stated reasons for changes. Final Guidelines For Statistical Adjustments of 1990 Census, 55 Fed.Reg. 9,838 (March 15, 1990).

lines articulating what *defendants* believe are the technical and nontechnical statistical and policy grounds for decision." Stip. at 3 (emphasis added). For better or for worse, the Department has done so. It is now clear that the guidelines are not those the plaintiffs would have authored; but it is equally clear that the right to directly contribute to substantive guideline language has been surrendered.

Quite simply, the Stipulation envisions a spectrum of acceptable guideline-making behavior by defendants. It is, by virtue of the Stipulation, defendants' duty to operate within that range. A range implies flexibility; but flexibility, as agreed upon by the parties, may be incorporated into a stipulation. *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d at 38. It is also the law of this circuit that a court should avoid unnecessary intrusion into the administrative process. *Schisler v. Heckler,* 787 F.2d 76, 84 (2d Cir.1986). A court clearly oversteps its bounds when it requires that an agency, to fulfill obligations under a consent decree, use certain language in promulgating regulations. *Rice v. Heckler,* 640 F.Supp. 1051, 1059 (S.D.N.Y.1986) (citing *Berger v. Heckler,* 771 F.2d at 1578).

Defendants could have responded generously, quenching plaintiffs' understandable but nonetheless insatiable thirst to know everything in advance of the Secretary's decision. Defendants have not done so, offering instead the bare minimum. The only question for the Court is whether the guidelines satisfy an acceptable threshold. I conclude that, while the issue is indeed close, defendants have satisfied their obligations thus far.

Although plaintiffs interpret the guidelines as biased against adjustment, the Court does not view them that way. The Stipulation itself is not perfectly neutral, and that lack of neutrality sometimes works in plaintiffs' favor. For example, defendants are required to publish a detailed statement and explanation, but only in the event the Secretary decides not to adjust. Stip. at 4. The ultimate decision on whether to adjust, of course, must be

fresh and unbiased, following the Secretary's *de novo* review of the record. That good faith discretion, I am convinced, is preserved under the guidelines.

Second, plaintiffs object to the failure of the guidelines to articulate sufficiently technical standards. In this regard, there has been much talmudic dissection by both sides of the Stipulation's requirement that defendants produce "guidelines" as opposed to "standards". Rising above a semantic wrangling of words, which may wrongly re-work the benefit of the original bargain, the Court returns to the mandate of the Stipulation that defendants develop and adopt guidelines to articulate grounds for decision. Stip. at 3. While, again, defendants have not done this to plaintiffs' satisfaction, defendants have, in the Court's judgment, complied with the terms of the Stipulation.

I find most troublesome plaintiffs' third and final objection, that the guidelines allow the Secretary to rely on impermissible factors in making the critical decision on adjustment. It is more accurate to say, however, that the guidelines list valid factors for decision-making but that they are subject—like any set of rules—to being impermissibly contorted to justify a flawed final decision.

Plaintiffs' protection against such anticipated abuse is the added requirement under the Stipulation that defendants fully explain a decision not to adjust. Because defendants have chosen to contribute adequate but minimal performance to satisfy their obligations at this stage, defendants clearly incur a heavier burden to explain why no adjustment was made in the event the Secretary elects to proceed with an actual enumeration.

Admittedly, guidelines five through eight lend themselves easily to abuse. This Court has already granted, *supra,* a declaratory judgment on the constitutional and statutory facets of adjustment. That judgment effectively moots plaintiffs' concerns over guideline five.

Regarding guideline six, the Court reminds defendants that the Stipulation provides:

If the Secretary determines to make an adjustment, defendants shall publish corrected 1990 Decennial Census population data *at the earliest practicable date* and, in all events, not later than July 15, 1991. If the Secretary determines not to make an adjustment, defendants shall publish *at the earliest practicable date* and, in all events, not later than July 15, 1991, a detailed statement of its grounds, including a detailed statement of which guidelines ... were not met and in what respects such guidelines were not met.

*Id.* at 4 (emphasis added). When the parties entered into the Stipulation, defendants affirmatively represented that the PES and adjustment-related operations were feasible goals as scheduled. Stip. at 2. Intentional inaction will not be tolerated. Defendants are expected, and indeed required, to honor their solemn commitments embodied in the Stipulation. *United States v. City of Yonkers,* 856 F.2d 444, 457 (2d Cir.1988), *rev'd on other grounds sub nom.,* — U.S. ——, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990).

I have considered, but rejected the option of vacating guidelines seven and eight. These guidelines may, in a constructive fashion, help define the meaning of "the most accurate census practicable." To that extent they are permissible factors. Again, the Court defers to the explicit language of the Stipulation providing that defendants will develop guidelines on what "they believe" to be the relevant grounds for decision. Defendants, however, are on notice, if it is not already clear, that backdoor attempts to evade their commitment will not be countenanced. *See City of Yonkers* at 457.

### B. *The Special Advisory Panel*

█ Plaintiffs return to court, charging in part that defendants have breached obligations to the Special Advisory Panel. Specifically, plaintiffs allege that defendants have impermissibly "juggled" the accounting books, depleting the $500,000 pan-el fund with improper and inflated charges. I agree.

The Stipulation is quite precise on matters involving the eight-member advisory panel. Concerning money matters, the Stipulation requires that the Department of Commerce pay members a daily stipend for each day the panel meets and reimburse members for expenses. Stip at 6. The Department must also furnish the panel with appropriate meeting space, office facilities and clerical assistance. In addition, "Defendants shall make available to the Panel a fund of $500,000 against which each co-chair may draw ... for appropriate resources to ensure that Panel members can perform their mission." *Id.*

The problem is that defendants have charged against the fund all costs for stipends, reimbursements and office space. To some panel members the office space provided was lavish and unnecessary, especially in light of the initial rent which was well above $100,000. Ericksen Affidavit at 13. Even by the government's own estimates rendered in February of this year, more than $340,000 has been syphoned from the fund. *Id.* at Exh. L.

A plain reading of the Stipulation convinces the Court that defendants' duty to provide specific services, as catalogued by the explicit language, is in addition to the duty of establishing the $500,000 fund. Oddly enough, defendants assured the Court at the hearing that money was not a problem and that, if it ran out, more could be found. Indeed, if appropriation ever did become a problem for defendants, the Court has resources of its own.[10]

### CONCLUSION

Accordingly, the motion for a declaratory judgment is hereby granted with the understanding that statutory and constitutional concerns will remain relevant in regard to the final form of statistical adjustment. The motion for a supplemental order is

---

**10.** *Cf. Missouri v. Jenkins,* — U.S. ——, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (to give effect to a desegregation order, federal court could authorize school district to submit levy to local tax authorities for adequate funding, even though satisfying levy violated tax laws).

granted in part and denied in part, as set forth herein.

SO ORDERED.