ROSENBERG DIAMOND
DEVELOPMENT CORP.,
Plaintiff,

v.

WAUSAU INSURANCE COMPANY,
Defendant.

No. 03 Civ. 3000(PKC).

United States District Court,
S.D. New York.

June 16, 2004.

John D. D'Ercole, Robinson, Brog, Leinwand, Greene, Genovese & Gluck, P.C., New York, NY, for plaintiff.

Sean H. Higgins, Marshall T. Potashner, Brian J. Weiss, Jaffe & Asher LLP, New York, NY, for defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

This is an action by Rosenberg Diamond Development Corporation ("Rosenberg") against Employers Insurance Company of Wausau, sued herein as Wausau Insurance Company ("Wausau") seeking recovery of indemnity and defense costs for two lawsuits that it alleges are covered under a Comprehensive General Liability ("CGL") policy issued by Wausau to Rosenberg providing coverage for "bodily injury" and "property damage" (identified in the policy as "Coverage A") (Policy, I, p. 1–6) and "personal injury" ("Coverage B") (Policy, I, p. 6–7). Rosenberg seeks partial summary judgment against Wausau who, in turn, seeks summary judgment dismissing all claims against it.

Because both the language of the policy and New York public policy precludes recovery of defense and indemnity costs for a claim against Rosenberg for intentional racial discrimination, I grant summary judgment to Wausau on the Coverage A claim. Construing the language of Coverage B consistent with New York public policy, I find that there is no defense or indemnity obligation for a claim by a prospective tenant nor for a claim by an existing tenant that is premised upon refusing to rent to a prospective tenant on racially discriminatory grounds. Because Rosenberg did not provide timely notice to Wausau with respect to a counterclaim for defamation in a suit which Rosenberg had brought, I also grant summary judgment to Wausau on this claim.

### The Fair Housing Suit

Before turning to the language of the policy and New York's public policy concerns, it is first useful to understand the nature of the first of the two claims for which Rosenberg seeks coverage. On May 8, 2001, Rosenberg, an owner and operator of rental units in the South Bronx, was sued in this district by a group known as Association of Community Organizations for Reform Now ("ACORN") and two individuals, *Association of Cmty. Organizations for Reform Now, et al. v. Rosenberg Diamond Dev. Corp.*, 01 Civ. 3876(LTS) (the "Fair Housing Suit"). The suit alleged that Rosenberg "systematically [was] engaging in racial discrimination" in violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3604, *et. seq.* (2003) (the "Fair Housing Act"), and parallel state statute and city code provision, N.Y. Human Rights Law § 296(5)(a)(1) (Consol.1995) and N.Y.C. Administrative Code § 8–107(5)(a)(1)–(2) (1996). More specifically, the complaint in the Fair Housing Suit alleged that between August 2000 and March 2001, ACORN employed twenty-two "testers" who presented themselves to Rosenberg as prospective tenants but did not specify in which Bronx neighborhood they were interested in living. The pleading alleged that depending on the color of their skin, prospective tenants

were "steered" to a Rosenberg property in the South Bronx or a rental agency in the North Bronx.

Within one day of the filing of suit, Rosenberg, through its insurance agent, put Wausau on notice of the claim. By letter dated May 24, 2001, Wausau wrote to Rosenberg disclaiming coverage because, it asserted, there had been no "occurrence" which the policy defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." It noted the existence of "[p]ersonal injury" coverage but concluded that "[n]one of the other coverages ... relate to the allegations." By agreement dated November 19, 2002, the Fair Housing Suit was settled with Rosenberg agreeing to pay $81,000 and agreeing to certain corrective actions designed to prevent racial steering in the future.

*Rule 56 and the Interpretation of Policy Coverage and Exclusion Issues*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (citation and quo-

tation marks omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

"When the sole question presented on a motion for summary judgment is the interpretation of a clear and unambiguous written agreement, the issue is one of law for the court." *Sidney Frank Importing Co., Inc. v. Farmington Cas. Co.*, 1999 WL 173263 at *3 (S.D.N.Y. Mar.26, 1999), *citing Pantone, Inc. v. Esselte Letraset, Ltd.*, 878 F.2d 601 (2d Cir.1989). This rule applies with equal force to policies of insurance. *See Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 775 F.Supp. 606, 609 (S.D.N.Y.1991).

Indisputably, the policy at issue imposes both the "right and duty to defend" covered claims. (Policy, Coverage A, ¶ 1(a), p. 1) The duty to defend is broader than the separate and distinct duty to indemnify. *See Avondale Indus., Inc. v. The Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir.1989), *citing Technicon Elec. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 73, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). If any allegations in the underlying action "arguably or potentially" bring the action within the scope of coverage, then there is a duty to defend. *Id.* at 1204, *citing Technicon*, 74 N.Y.2d at 73, 544 N.Y.S.2d 531, 542 N.E.2d 1048. The duty to defend is triggered if the claims "may rationally be said to fall within policy coverage...." *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310–11, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984), *quoting Schwamb v. Fireman's Ins.*

*Co.,* 41 N.Y.2d 947, 949, 394 N.Y.S.2d 632, 363 N.E.2d 356 (1977).

■ Under New York law, an insurer seeking to avoid its duty to defend bears a heavy burden. *See Avondale Indus.,* 887 F.2d at 1204. "[B]efore an insurance company is permitted to avoid policy coverage, it must ... establish[ ] that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." *Seaboard,* 64 N.Y.2d at 311, 486 N.Y.S.2d 873, 476 N.E.2d 272 (citation omitted). The insurer must demonstrate, as a matter of law, that the claims and allegations in the underlying suit are "solely and entirely" within specific and unambiguous exclusions from the policy's coverage. *Avondale Industries,* 887 F.2d at 1204–05, *citing International Paper v. Continental Cas. Co.,* 35 N.Y.2d 322, 325, 361 N.Y.S.2d 873, 320 N.E.2d 619 (1974).

*Coverage A: Bodily Injury and Property Damage*

■ Wausau issued a policy to Rosenberg covering the period May 18, 1999 to May 18, 2001. The Policy provided commercial general liability coverage, as well as an array of other coverage. Specifically it covered "bodily injury" or "property damage" caused by an "occurrence" taking place in the "coverage territory." (Policy, V, pp. 15–19) There is no dispute that the event took place within the covered territory, which includes the United States. (Policy, V ¶ 4, p. 15) "Bodily injury" is defined to include "bodily injury, sickness or disease...." (Policy at ¶ 3, p. 13) The Fair Housing Suit alleges that the plaintiffs suffered "humiliation, mental anguish and emotional distress," (FHS Complaint ¶ 49) and defendant does not dispute that the bodily injury requirement has been satisfied.

The parties dispute whether the definition of "occurrence" has been met in this case. The term is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Policy, V ¶ 12, p. 18) Defendant argues that because the FHS Complaint alleges conduct that is intentional in nature, it is not "an accident."

Here, the underlying suit was specific in its allegations. It asserted that Rosenberg steered white "testers" who had not specified a neighborhood of interest to an unaffiliated real estate agency where they would be directed to apartments in the North Bronx. Those who were black or Latino were invited to complete an application for a Rosenberg apartment in the South Bronx. *See* FHS Complaint ¶¶ 4–7. Of course, the question in this case is not whether the plaintiffs in the Fair Housing Suit alleged a viable claim or a factually meritorious claim. Rather, it is whether they alleged a covered claim.

Under the Fair Housing Act, a violation may be found on either a theory of disparate impact or disparate treatment. *See LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995). Rosenberg has tried to recast the Fair Housing Suit as asserting a disparate impact claim—a claim that a policy that is facially neutral has a disproportionate impact on one group. But there was nothing neutral on the face of the rental policy alleged. The Fair Housing Suit did not allege that facially neutral circumstances, such as educational or occupational background or letters from long established references, had a disproportionate impact on one group. Rather, the treatment was alleged to be different "simply on the basis of their race" or "the color of his or her skin." (FHS Complaint ¶¶ 9, 24).

The significance of the distinction between disparate impact and disparate

treatment on the application of the Policy's "occurrence" requirement is illustrated by the interpretations of the New York Superintendent of Insurance. From time to time, the Superintendent issues directives to carriers known as Circular Letters that, while not having the force of a statute or regulation, are an authoritative source of his interpretation of existing law. *See Village of Kiryas Joel Local Dev. Corp. v. Insurance Co. of N. Am.*, 996 F.2d 1390, 1394 (2d Cir.1993) ("... Circular Letters often contain regulatory pronouncements that are less formal than regulations. Generally, New York cases decline to enforce new extra-statutory obligations imposed via Circular Letters, ... but do give effect to Circular Letters that interpret existing law or categorize insurance policies ...." (citations omitted)).

In Circular Letter 1994–6, the Superintendent restated the long held view that coverage for a claim alleging disparate treatment violates New York public policy:

> Discrimination based upon disparate treatment is an intentional wrong whose resultant harm flows directly from the acts committed, and liability coverage for it is impermissible. The Department's longstanding prohibition against coverage for discrimination claims generally originated at a time, some thirty years ago, when virtually all discrimination claims were of this type.

The same Circular Letter made known the Superintendent's view that a disparate impact claim could be insured because "the discriminatory result does not directly proceed from specific discriminatory acts against individuals" but are "normally grounded upon statistical or other numerical profiles that reflect disparities between or among groups ..." The Circular Letter also expressed the view that insurance coverage for an employer's vicarious liability based upon a subordinate employee's ac-

tions, even if they amounted to disparate treatment, would not offend public policy. These views were all reaffirmed in a General Counsel's Opinion issued nearly six years later. (*See* Gen. Couns. Op. 1 Mar. 17, 2000)

The Circular Letter only serves to reinforce the conclusion that the Fair Housing Suit did not allege a covered "occurrence" and that the suit alleges conduct that was expected and intended. The Fair Housing Suit did not allege that Rosenberg should be held vicariously liable for one-on-one discrimination by a few rogue employees. Rather it alleges that Rosenberg, the corporate entity, "choose to perpetuate racial separation" and "was systematically engaging in racial discrimination...." (FHS Complaint ¶¶ 1, 3). As noted, it was the "color of his or her skin" which allegedly caused Rosenberg to treat a prospective tenant differently, and not the application of a facially neutral policy.

The conclusion that I reach is consistent with that of other courts faced with similar issues. In *Hubel v. Madison Mut. Ins. Co.*, No.2001–5404, 2003 WL 21435624, at *1–2 (N.Y. Sup., May 16, 2003), the plaintiff in the underlying action had alleged that after the landlord read her rental application that disclosed she had six children, he refused to rent the premises to her in violation of the Fair Housing Act. The Court concluded that there could be no coverage: "disparate treatment discrimination, by its very definition, results from intentional acts. Clearly, an intentional act is not an 'accident'. Nor is it an 'occurrence' within the meaning of the applicable commercial landlord policy...." *Id.* at *5. *See Sidney Frank Importing v. Federal Ins. Co.*, 1999 WL 173263, at *6 (S.D.N.Y., Mar.26, 1999) (no covered "occurrence" where underlying suit alleged claims of quid pro quo sexual harassment by senior employees, despite further allegation of "negligent" hiring and training).

In contrast, in *American Mgmt. Ass'n v. Atlantic Ins. Co.*, 168 Misc.2d 971, 641 N.Y.S.2d 802 (N.Y.Sup.1996), *aff'd*, 234 A.D.2d 112, 651 N.Y.S.2d 301 (1st Dep't 1996), *leave to appeal denied*, 90 N.Y.2d 888, 661 N.Y.S.2d 832, 684 N.E.2d 282 (1997), the court concluded that there was a covered duty to defend where the defendant in the underlying action had defended the age discrimination claim on the ground that "even if its actions had a discriminatory result they were not intended to discriminate." *Id.* at 974, 641 N.Y.S.2d 802. The court reasoned that the claim was in the nature of a disparate impact claim and, thus, there was coverage. In dictum, the *American Mgmt.* court suggested that, "even if coverage were against public policy or [the insured] was found to have practiced disparate treatment age discrimination, [the insurer] would still have a duty to defend." *Id.* at 979, 641 N.Y.S.2d 802. I take this to mean that, although the court construed the pleadings to allege a covered claim, it could not exclude the possibility that at the trial the evidence might reveal that it was actually a disparate treatment case and hence not subject to the insurer's obligation to indemnify; if that were to eventuate, it would not retroactively negate the duty to defend that had attached at the point that the possibility of a covered claim was found. But, in the case before me, only an uncovered claim is alleged and, hence, no duty to defend attaches at the outset.

*Coverage B: Personal Injury and Advertising Injury*

 Rosenberg alleges that, in addition to the Coverage A provision for "bodily injury" claims, the FHA Suit is insured under the Coverage B provision of this CGL policy. Coverage B is titled "Personal and Advertising Injury Liability" and obligates the insurer to pay damages because of "personal injury" or "advertising injury" and establishes the "right and duty to defend the insured" on such claims. (Policy, Coverage B, ¶ 1(a), p. 6) According to the insured, coverage is provided under the following portion of the definition of "personal injury" found in Section V, Paragraph 13, subparagraph c of the Policy.[1]

> "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses committed in the course of your business ... c. The wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies provided that the wrongful eviction from, wrongful entry into or invasion of right of private occupancy is by or on behalf of the owner, landlord or lessor of the room, dwelling, or premises....

The Seventh Circuit has had occasion to construe the identical policy language under Wisconsin law as applied to a suit brought under the Fair Housing Act, *United States v. Security Mgmt. Co., Inc.*, 96 F.3d 260, 264–67 (7th Cir.1996). There the government had alleged that apartment owners and managers had discriminated against black and Hmong persons and based its proof on the use of "testers", as was done in this case. The court concluded that "wrongful eviction" and "wrongful

---

1. As Wausau correctly points out in its brief, the version of the language that Rosenberg cites in its brief was superceded by an "amendment endorsement" the authenticity of which Rosenberg does not dispute and, indeed, submits in support of summary judg-

ment. (Berman Aff't, Ex A at p. 329) I quote only the language from the "amendment endorsement", although I note that the difference in the language is material in that the "that a person occupies" language was not present in the unamended policy language.

entry" were not implicated and that coverage, if at all, could be premised on the "invasion of the right of private occupancy" language. "Simply put, coverage is extended to that category of cases which involve the invasion of a person's right of private occupancy." *Id.* at 264. The Court rejected the district court's reading of "right of private occupancy" to mean right *to* private occupancy. "The actual language of the policy ... involves the more narrow right 'of' private occupancy and all of the parties agree that the 'testers' did not hold a right of private occupancy at the time of the alleged discriminatory conduct." *Id.* at 266. Accordingly, the Court concluded that there was no Coverage B coverage for personal injury.

Rosenberg relies upon *Gardner v. Romano,* 688 F.Supp. 489, 492–93 (E.D.Wis. 1988), a case that found the policy language to be ambiguous, construed it against the insurer and concluded that the insurer had not met its burden of showing that claims by both tenants and prospective tenants were covered. The policy language was the unamended version of Coverage B and did not contain the limiting phrase "that a person occupies." Moreover, *Gardner* was decided under Wisconsin law and the Seventh Circuit's subsequently expressed view in *Security Management,* also decided under Wisconsin law, has displaced it. *See* 96 F.3d at 264 (reversing the district court and noting its reliance upon *Gardner* ).

In addition, I note that the definition in subparagraph c requires that the place of wrongful entry, wrongful eviction or invasion of the right of private occupancy be of a place "that a person occupies." As pro-

spective tenants, the plaintiffs in the Fair Housing Suit could not meet that test. *See Powell v. Alemaz, Inc.,* 335 N.J.Super. 33, 760 A.2d 1141, 1147 (2000) ("By removing the word 'other' ... and adding the phrase, 'that a person occupies' ... it can no longer be seriously argued that the phrase ... includes actions for personal injuries arising from racial discrimination to prospective tenants."); *Groshong v. Mutual of Enumclaw Ins. Co.,* 985 P.2d 1284, 329 Or. 303 (1999) (no duty to defend under Oregon law, even in the absence of phrase "that a person occupies" because the prospective tenant had no possessory interest in the premises); *see also Bernstein v. North East Ins. Co.,* 19 F.3d 1456 (D.C.Cir.1994) (applying D.C. law, no duty to defend for claim by prospective tenant under similar language).

It is true, as Rosenberg points out, that Luis de Jesus, one of the plaintiffs in the Fair Housing Suit, was at the time of suit an existing tenant, but that does not alter the analysis. His claim did not relate to a wrongful entry, wrongful eviction or invasion of his right of private occupancy. He sought no new right of occupancy nor was he denied his existing right of occupancy. Rather, his claim was that "he has an interest in living in a racially integrated community." (FHS Complaint ¶ 17)[2] He claimed that denying occupancy to a third person caused injury to him. Though it likely was a cognizable claim, it was derivative of the intentional discrimination suffered by one who was not a tenant. To construe the language "invasion of the right of private occupancy of a ... premises that a person occupies" so broadly as to

---

**2.** In sharp contrast to the allegations in this case, the court in *Hobbs Realty & Const. Co. v. Scottsdale Ins. Co.,* 593 S.E.2d 103 (N.C.App. 2004), found coverage under Coverage B for allegations that, after the tenants had paid in full to lease the premises, the landlord refused

to give the key to their biracial daughter, allegedly uttering racial epithets at her and her friends, including an African American. There, the "right of occupancy" was manifest. The opinion does not reflect any discussion of North Carolina public policy.

reach an existing tenant's injury resulting from the intentional discrimination aimed at a prospective tenant would require an unwarranted reading of the clause. It would also be a construction that would run afoul of New York's public policy against insuring claims for intentional discrimination. I grant summary judgment to Wausau on Rosenberg's claim for defense and indemnity under Coverage B.

*The Defamation Counterclaim*

■ Separate and apart from the Fair Housing Suit, Rosenberg, David Diamond and Robert Rosenberg (collectively the "Bronx Plaintiffs"), elected to file a state court suit against ACORN, one of the plaintiffs in the Fair Housing Suit, and several individuals with a connection to ACORN (collectively the "Bronx Defendants"), *Rosenberg Diamond Dev. Corp., et al. v. Heather Appel, et al.,* Index No. 17971/00, Supreme Court, Bronx County (the "Bronx Acorn Suit"). The suit was commenced on June 20, 2000, slightly less than a year before the Fair Housing Suit, and alleged claims sounding in extortion, trespass, libel and slander. On July 27, 2000, the Bronx Defendants counterclaimed against all Bronx Plaintiffs alleging claims (1) for defamation; (2) a statutory cause of action brought under N.Y. Civil Rights Law § 76–a (1)(a) (Consol.2001), the so-called SLAPP statute (Strategic Litigation Against Public Participation); and (3) a statutory claim under N.Y. Real Property Law § 230 (McKinney 1989) barring certain actions by landlords. By Notice of Motion dated August 11, 2000, the Bronx Plaintiffs moved to dismiss the first and second counterclaims. The Bronx Defendants responded with a cross-motion to dismiss or for summary judgment on certain of the claims that the Bronx Plaintiffs had alleged. By order entered February 5, 2002, Justice George Friedman dismissed the defamation coun-

terclaim and otherwise denied Bronx Plaintiffs' motion. He also granted the Bronx Defendants certain relief on their motion.

Rosenberg seeks recovery of defense costs incurred on its successful defense of the defamation counterclaim under its Policy with Wausau. It concedes that it did not notify Wausau of the existence of the counterclaim until July 2001, about a year after it had been asserted and about eleven months after it filed its ultimately successful motion to dismiss. (Rosenberg 56.1 Statement at ¶ 22) Wausau denied coverage on the ground that notice of suit had not been provided to the insurer "as soon as practicable" as required by the Policy.

Generally speaking, New York follows a rule that does not require a showing of prejudice when an insurer receives a late notice of a claim. *See, e.g., Security Mut. Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 440, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972). The New York Court of Appeals drew a distinction between a late notice of claim and a late notice of suit holding that, in the context of Supplemental Uninsured Motorist ("SUM") coverage, the insurer bore the burden of proving late notice of suit. *See In the Matter of Brandon,* 97 N.Y.2d 491, 743 N.Y.S.2d 53, 769 N.E.2d 810 (2002). The opinion is narrow in scope, but Rosenberg urges that New York will likely expand the rule outside the arena of SUM coverage. The Second Circuit had previously certified a related question "[w]here an insured has already complied with a policy's notice of claim requirement, does New York require the insurer to demonstrate prejudice in order to disclaim coverage based on the insured's failure to comply with the policy's notice of suit requirement?" *Varrichio v. Chicago Ins. Co.,* 312 F.3d 544 (2d Cir.2002). The New York Court of Appeals accepted this

certified question on December 12, 2002, but the parties thereafter settled, 328 F.3d 50 (2d Cir.2003).[3] In this case, I need not address the issue of whether a showing of prejudice is required because, assuming *arguendo* that such a showing is necessary, this insurer meets that burden on undisputed facts.

It is true, as Rosenberg points out, that it won the day on the defamation claim. It seeks to recover its legal fees, and that is where the prejudice comes in to play. Rosenberg's counsel employed a form of billing—"block billing"—that Wausau points to as the source of prejudice. Rather than maintain separate billing accounts or sub-accounts for each new matter it undertook for Rosenberg, the law firm lumped all services into one undifferentiated bill. The bills do not merely combine the defense of the counterclaim with the prosecution of the main claim but they combine the Bronx Acorn Suit with the Fair Housing Suit and any other matter that was then underway for Rosenberg. There are general time entries such as "Review of Article in Real Estate Weekly" (9/20/00 JDD) and references to litigation matters that do not appear on their face to relate to either the Bronx Acorn Suit or the Fair Housing Suit: "Review of Judge Asch's Decision" (12/22/00 JDD), "Opposition to Motion to Set Aside Report of JHO . . . ." (1/8/01 JDD), "Telephone Conference with Terrance Reed Re: Possible RICO Claim" (7/21/00 JDD). Post-hoc breakouts of entries in time records to show their applicability to a specific claim or issue are common in fee applications. But the circumstances here are fundamentally different. Wausau has shown that it would have insisted upon a separate billing account to track the time chargeable to the defense of the counterclaim, mindful that if it were not closely monitored there could be a spillover between it and other services relating to the Bronx Acorn Suit. Here, the need for a separate billing account was foreseeable and the insurer was deprived of this meaningful tool to control and monitor costs. When asked at his deposition to explain what portion of a time entry related to a particular claim, Rosenberg's lead lawyer was unable to do so in several instances. For example, he was asked about one time entry:

Q. As you sit here today, it's quite possible that a good chunk of this 2.2 hours does not relate at all to the defense of the counterclaims in the State Court Action?

\* \* \* \* \* \*

A. Some portion may not relate to the defense of the counterclaim. Although at that point we got the Answer, we were considering a motion to dismiss two of the claims, two of the counterclaims, and I believe that that was a large part of our discussions.

\* \* \* \* \* \*

Q. . . . [W]ould you agree under oath today that a portion of this 2.2 hours does not relate to the defense of the counterclaims.

A. I agree.

Q. Can you tell me how many, what portion of that 2.2 hours does not relate?

A. I can't say exactly.

(Defendant's Rule 56.1 Statement ¶ 53, p. 16).

Wausau also asserts that it was deprived of the ability to participate in the selection of counsel and, as a result, the simple

---

**3.** The certified question is not identical to the one presented here because it supposes that a timely notice of claim has been provided. Here, because the first awareness of a claim occurred, according to plaintiffs, at the moment the defamation counterclaim was asserted, the only notice given or required was notice of suit.

motion was made more costly. I do not need to reach that assertion of prejudice because I find prejudice to be sufficiently established by the "block billing" practice. Thus, assuming *arguendo* that an insurer under a CGL policy must demonstrate prejudice from a late notice of suit, Wausau has demonstrated such prejudice from undisputed facts and, accordingly, I grant summary judgment to defendant and dismiss the claim for recovery of fees paid in defense of the defamation counterclaim in the Bronx Acorn Suit.

*Conclusion*

The motion for summary judgment of plaintiff Rosenberg is DENIED in its entirety. The motion for summary judgment of defendant Wausau is GRANTED in its entirety. Judgment for the defendant will enter.

SO ORDERED.